**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| IVANA KIROLA, On Behalf of Herself and The Certified Class of Similarly Situated Persons, *Plaintiff-Appellant*, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO; GAVIN NEWSOM, in his official capacity as Mayor; AARON PESKIN, in his official capacity as President of the Board of Supervisors; JAKE MCGOLDRICK; MICHELA ALIOTO-PIER; ED JEW; CHRIS DALY; SEAN ELSBERND; BEVAN DUFFY; TOM AMMIANO; SOPHIE MAXWELL; ROSS MIRKARIMI; GERARDO SANDOVAL, in their official capacities as members of the Board of Supervisors, *Defendants-Appellees*. | No. 14-17521 <br><br> D.C. No. 4:07-cv-03685-SBA <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Saundra B. Armstrong, District Judge, Presiding

Argued and Submitted December 14, 2016
San Francisco, California

Filed June 22, 2017

Before:  Diarmuid F. O'Scannlain, Ronald M. Gould,
and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Gould

## SUMMARY[*]

### Americans with Disabilities Act

The panel affirmed in part and reversed in part the district court's judgment, after a bench trial, in favor of the City and County of San Francisco in a class action brought under Title II of the Americans with Disabilities Act, alleging that San Francisco's public right-of-way, pools, libraries, parks, and recreation facilities were not readily accessible to and usable by mobility-impaired individuals.

Reversing in part, the panel held that the plaintiff established Article III standing to pursue injunctive relief by showing that she suffered in injury in fact through evidence that she encountered an access barrier and either intended to return or was deterred from returning to the facility in question.  The panel held that to establish standing, the plaintiff did not need to show that she was deprived of meaningful access to a challenged service, program, or activity in its entirety; rather, this was the standard for relief on the merits.  The panel held that the plaintiff also

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

established causation and redressability, and therefore established standing to challenge barriers at the facilities that she visited. The panel held that, in addition, the certified class had standing to challenge the facilities that the plaintiff did not personally visit.

On the merits of claims related to newly constructed or altered facilities, the panel explained that the Architectural and Transportation Barriers Compliance Board ("Access Board") produces the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), which set a baseline of nonbinding requirements. The Department of Justice ("DOJ") then adopts binding regulations that are consistent with the minimum standards put out by the Access Board. DOJ's 2010 standards set a timetable allowing public entities to choose to comply either with the original 1991 ADAAG standards or with other federal standards, and San Francisco chose to comply with the 1991 ADAAG standards. These standards include detailed design guidelines for particular features of facilities, as well as facility-specific requirements.

The district court found that the plaintiff had proven that the City's new or altered facilities departed from ADAAG in only a few isolated instances. The panel held that, in making this finding, the district court erred by concluding that none of the plaintiff's experts was reliable and then concluding that all of the City's experts were reliable. The district court's analysis relied on several regulatory misinterpretations, including its conclusion that ADAAG did not apply to San Francisco's public right-of-way, parks, and playground facilities. The panel held that, even though ADAAG did not include facility-specific guidelines particular to those types of facilities, ADAAG's feature-specific requirements applied. Because the district court's approach to the plaintiff's

experts' credibility was based on legal errors, the panel remanded for reevaluation of the extent of ADAAG noncompliance.

On the merits of claims related to existing facilities, the panel affirmed the district court's finding that the City's public right-of-way and "RecPark" programs were accessible when viewed in their entirety.

The panel affirmed in part, reversed in part, and remanded with instructions for the district court to apply ADAAG as the panel had interpreted it, reevaluate the extent of ADAAG noncompliance, and then revisit the question of whether injunctive relief should be granted.

## COUNSEL

Guy B. Wallace (argued), Jennifer A. Uhrowczik, Sarah Colby, and Mark T. Johnson, Schneider Wallace Cottrell Konecky Wotkyns LLP, Emeryville, California; Monique Olivier, Duckworth Peters Lebowitz Olivier LLP, San Francisco, California; James C. Sturdevant, The Sturdevant Law Firm, San Francisco, California; Ray A. Wendell, Linda M. Dardarian, and Barry Goldstein, Goldstein Borgen Dardarian & Ho, Oakland, California; José R. Allen, Palo Alto, California; for Plaintiff-Appellant.

James M. Emery (argued) and Elaine M. O'Neil, Deputy City Attorneys; Ronald P. Flynn, Chief Deputy City Attorney; Dennis J. Herrera, City Attorney; Office of the City Attorney, San Francisco, California; for Defendants-Appellees.

Jinny Kim and Alexis Alvarez, The Legal Aid Society –
Employment Law Center, San Francisco, California, for
Amici Curiae The Legal Aid Society – Employment Law
Center, AIDS Legal Referral Panel, American Association of
People with Disabilities, API Legal Outreach, California
Foundation for Independent Living Centers, Civil Rights
Education and Enforcement Center, Disability Rights
Advocates, Disability Rights California, Disability Rights
Education and Defense Fund, Disability Rights Legal Center,
The Impact Fund, Independent Living Resource Center San
Francisco, National Disability Rights Network, San Francisco
Senior and Disability Action, and Swords to Plowshares.

Marc J. Poster and Timothy T. Coates, Greines Martin Stein
& Richland LLP, Los Angeles, California, for Amici Curiae
League of California Cities, International Municipal Lawyers
Association, and California State Association of Counties.

## OPINION

GOULD, Circuit Judge:

Title II of the Americans with Disabilities Act provides
that "no qualified individual with a disability shall, by reason
of such disability, be excluded from participation in or be
denied the benefits of the services, programs, or activities of
a public entity, or be subjected to discrimination by any such
entity." 42 U.S.C. § 12132. We address whether the City and
County of San Francisco have complied with their obligations
under this law. In particular, we are concerned with whether
San Francisco's public right-of-way, pools, libraries, parks,
and recreation facilities are readily accessible to and usable
by mobility-impaired individuals.

**I**

Plaintiff-Appellant Ivana Kirola suffers from cerebral palsy and moves within the city in a wheelchair. A resident of San Francisco, her ability to move about the city and benefit from its public services depends in part on the City and County's compliance with disability access laws.

On July 17, 2007, Kirola filed a putative class action alleging that the City and County of San Francisco, the Mayor of San Francisco, and members of the San Francisco Board of Supervisors (collectively, "the City") had systematically failed to comply with federal and state disability access laws, seeking declaratory and injunctive relief. Relevant here, Kirola alleged that the City's public libraries, pools, Recreation and Parks Department ("RecPark") facilities,[1] and pedestrian right-of-way did not comply with Title II of the Americans with Disabilities Act ("ADA") and related regulations.

On June 7, 2010, the district court certified a class consisting of:

> All persons with mobility disabilities who are allegedly being denied access under Title II . . . due to disability access barriers to the following programs, services, activities and facilities owned, operated and/or maintained

---

[1] ADA regulations define "Facility" broadly to include "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." 28 C.F.R. § 35.104.

by the City and County of San Francisco:
parks, libraries, swimming pools, and curb
ramps, sidewalks, crosswalks, and any other
outdoor designated pedestrian walkways in
the City and County of San Francisco.

The district court estimated that about 21,000 persons with
mobility disabilities live in San Francisco. In this lawsuit,
Kirola seeks to advance their important rights.

In April and May of 2011, the district court held a five-
week bench trial featuring testimony by 36 different
witnesses. *Kirola v. City & Cty. of San Francisco*, 74 F.
Supp. 3d 1187, 1200 (N.D. Cal. 2014). The district court
made the following findings of fact:

*Class Members*. Seven class members or mothers of class
members testified, including Kirola. *Id.* at 1217. Each class
member suffered from a disability and was mobility-
impaired. *Id.*

Kirola testified that as a resident of San Francisco, she
had encountered the following access barriers related to the
City's public services:

> (1) three stretches of sidewalk containing
> "bumps," (2) a sidewalk where her wheelchair
> became stuck in a tree well; (3) one street
> corner that lacked curb ramps, (4) one street
> corner that provided only a single curb ramp,
> (5) errant step stools at three of the City's
> libraries, (6) three inaccessible pools, and
> (7) steep paths at one park.

*Id.* at 1240.  The other testifying class members or their mothers described various other access barriers that they had encountered while enjoying San Francisco's public services. *Id.* at 1217–21.

*Accessibility Infrastructure.*    San Francisco handles disability access concerns through a collection of institutional mechanisms.  At the top is the Mayor's Office on Disability ("MOD"), an eight-person office that oversees the "various departments, positions, policies, and programs" dedicated to disability issues.  *Id.* at 1202.  The staff of MOD "regularly work with and receive input from a variety of organizations devoted to disabled access," as well as maintain a public website with extensive information on disability access resources.  *Id.* at 1202–03.

Next is the Mayor's Disability Council, an advisory body of members of the disabled community that "provide[s] a public forum to discuss disability issues." *Id.* at 1203.  The Mayor's Disability Council acts as the primary liaison to San Francisco's disabled community.  *Id.*

Third are ADA coordinators located in each City department that has more than fifty employees.  *Id.*  The ADA coordinators investigate disability access complaints and serve as resources for their respective departments on disability access issues.  *Id.*

Last is a citywide grievance procedure overseen by MOD. *Id.*  Upon receipt of an access complaint, MOD sends a copy to the ADA coordinator at the relevant department, who in turn conducts an investigation.  *Id.* at 1204.  There is a separate procedure for complaints related to curb ramps.  *Id.* at 1204–05.

Funding for disability access improvements is governed by the City's Capital Plan. *Id.* at 1205. The City estimates that it will spend $670 million on ADA compliance between 2012 and 2021.[2] *Id.*

*Public Right-of-Way.* San Francisco operates a network of "approximately 2,000 miles of sidewalks, 27,585 street corners, and roughly 7,200 intersections," all overseen by the Department of Public Works. *Id.* at 1205.

Scott Mastin, one of Kirola's experts, testified that he inspected 1,432 curb ramps throughout the pedestrian right-of-way and identified 1,358 as inaccessible or noncompliant with ADA standards. *Id.* at 1222. Another expert, Dr. Edward Steinfeld, conducted fourteen site inspections involving the public right-of-way and at thirteen of them found curb ramp access barriers. *Id.* Expert Peter Margen inspected ten intersections or street segments and found "major barriers to accessibility" that rendered "the system as a whole not accessible." *Id.* Finally, expert David Seaman analyzed curb ramp data held in a government database, and prepared maps depicting which corners lacked curb ramps or had ramps in low condition. *Id.* at 1224.

The City presented experts that disagreed with these conclusions and criticized the methods employed by Kirola's experts. Defense expert Larry Wood testified that among Kirola's experts, "there was no common way of measuring anything, such as slopes, sidewalks, [and] curb ramps." *Id.*

---

[2] A significant portion of the trial was also dedicated to evidence of the City's various plans and policies for addressing access barriers. *See, e.g.*, *id.* at 1216. The specific content of these plans and policies is not relevant to the issues on appeal.

at 1222 (alteration in original). Rather, "they all seemed to have a different approach that was somewhat haphazard." *Id.* Wood criticized Mastin in particular for not considering dimensional tolerance in his measurements. *Id.* at 1222–23. According to Wood, dimensional tolerances are industry-accepted deviations from applicable design requirements, such as those required by the ADA and its regulations. *Id.* Wood also faulted Mastin for using an incorrect benchmark when determining whether the slopes of curb ramps were ADA compliant. *Id.* at 1223. And Woods complained that Kirola's experts cited potholes or utility grates as access barriers, even when there was a wide path around the pothole or grate. *Id.*

The district court took issue with Kirola's experts' methods as well. The court noted that her experts did not "consider the height of the curbs or widths of the sidewalks they examined," even though those are "critical measurements that may impact the design, construction, and accessibility conclusions of the curb ramps at issue." *Id.* at 1222. Agreeing with Wood, the district court explained that Kirola's experts used inconsistent methods to measure slopes, sidewalks, and curb ramps. *Id.* The district court also criticized Kirola's experts for recording curb-ramp slope by measuring the "maximum localized variation," which is the steepest individual point along the slope of a ramp. *Id.* at 1223. In the district court's view, Kirola's experts should have considered the overall "rise in run," which is the average slope of the ramp. *Id.*

In evaluating the pedestrian right-of-way, Kirola's experts applied the standards found in the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities ("ADAAG"). *Id.* at 1222. The district court faulted

Kirola's experts for this as well, stating that ADAAG was inapplicable to public rights-of-way. *Id.* 1222–23. The district court also stated that even if ADAAG did apply to the public right-of-way, it only applied to parts of the right-of-way that had been constructed or altered after January 26, 1992. *Id.* at 1223. The district court found that Kirola's experts had applied ADAAG to all curb ramps, without first determining the date on which each ramp had previously been constructed or altered. *Id.*

Furthermore, the district court found that Seamon's analysis of government curb ramp data did not include analysis of accessible curb ramps, even when those accessible ramps provided an alternative means of using a sidewalk. *Id.* at 1224. The district court also found that the information that Seamon relied on was not up to date or comprehensive. *Id.*

Finally, the district court expressed concern about the qualifications of the individuals who conducted Kirola's inspections. *Id.* at 1222. The court noted that Steinfeld used mostly student interns for his inspections, and that Margen was not an architect. *Id.* Nevertheless, the district court qualified Mastin, Steinfeld, Margen, Seamon, and another witness named Gary Waters, all as experts. *Id.* at 1221.

*Library Program.* San Francisco's library program consists of a main library and twenty-seven branch libraries located throughout the City. *Id.* at 1210. Kirola's experts inspected eighteen of the City's twenty-eight total libraries. *Id.* at 1226. Margen, Mastin, and Steinfeld all testified to discovering access barriers at the libraries, including "narrow aisles, inadequate turnaround space at the end of aisles,

inaccessible restrooms, inaccessible seating, and excessive door pressure." *Id.*

The City's experts conducted their own inspections, visiting sixteen of the libraries that Kirola's experts inspected. *Id.* at 1229. Wood testified that based on his inspection, each of the sixteen libraries featured:

> (1) an accessible route from the entrance to the public sidewalk; (2) an accessible entrance; (3) automatic door openers; (4) elevators within multi-story buildings; (5) access to all library levels; (6) accessible checkout counters; (7) accessible tables; (8) accessible doors along all accessible routes; (9) accessible copy machines; (10) accessible toilet rooms for men and women; (11) accessible drinking fountains; and (12) accessible book stacks.

*Id.* Nevertheless, based on Wood's inspection, MOD advised the library of three to four access barriers that it thought should be addressed, as well as several maintenance issues. *Id.* At the time of trial, the City was in the process of addressing these requests. *Id.*

The City also presented evidence that the library program offers "a range of non-structural solutions to ensure access to its programs and events, including assistive technologies, books by mail, a Library on Wheels, a Library for the Blind and Print Disabled, a Deaf Services Center, and Accessibility Tool Kits." *Id.* at 1214.

The district court again criticized Kirola's experts. According to the district court, Kirola's experts improperly applied the requirement for a 48-inch-wide U-turn area to aisles between shelves, which under applicable regulations only had to be 36 inches wide. *Id.* at 1228. Moreover, some of the doors Kirola's experts examined for excessive pressure were fire doors, which the district court maintained are allowed to possess greater pressure. *Id.* The district court also found that the effects of some of the access barriers cited by Kirola's experts were alleviated by other accessible features. *Id.* For instance, some of the difficult-to-move doors had electric door openers. *Id.* And at the Richmond library, one ramp was not accessible, but another ramp leading to the same place was accessible. *Id.* The district court's criticism regarding the failure to consider dimensional tolerances applied to Kirola's experts' library examinations as well. *Id.* at 1227.

*Aquatic Program.* San Francisco's aquatics program consists of nine public swimming pools. *Id.* at 1210. Of these nine pools, six have been renovated to improve accessibility. *Id.* at 1213.

Kirola's experts inspected seven of the nine pools, though three of the pools they inspected were the "limited access" pools that had not been renovated to improve accessibility. *Id.* at 1226. Steinfeld testified that he found numerous access barriers at the pools. *Id.* at 1226–27. These included "inaccessible paths of travel, inaccessible parking, inadequate signage, missing handrails, inaccessible handrails, heavy doors, drinking fountains lacking [adequate] knee clearance, and non-detachable shower heads." *Id.*

The City's experts visited five pools, three of which were pools that Kirola's experts had inspected. *Id.* at 1229. Contrary to Steinfeld's testimony, Wood explained that each of the five pools he visited had "the features necessary to facilitate accessibility." *Id.* These features included:

> (1) an accessible route from the property line to the building; (2) an accessible entry; (3) an accessible check-in counter; (4) accessible signage; (5) accessible ramps or curb ramps where necessary; (6) accessible toilets; (7) accessible showers; (8) accessible locker rooms; and (9) transfer lifts to assist individuals with mobility impairments in getting into and out of the pool.

*Id.*

*RecPark Program.* The City's RecPark program encompasses "220 parks spanning 4,200 acres of park space and 400 structures (i.e., clubhouses, recreation centers, etc.) thereon." *Id.* at 1210. The program has a website, which provides information about which of its locations are accessible. *Id.* at 1215–16.

Of the 220 total locations, Kirola's experts inspected 13 parks, 7 mini-parks, and 16 playgrounds. *Id.* at 1227. The district court gave the following description of Kirola's experts' findings:

> Kirola's experts identified various access barriers, including an inaccessible entrance ramp at Balboa Park, a cracked sidewalk at Jefferson Square Park, limited accessible

paths of travel at Golden Gate Park's Japanese Tea Garden and Rose Garden, inaccessible paths connecting the main facilities at Glen Canyon Park, and placement of flora and fauna signage at Glen Canyon Park too far from accessible trails.

*Id.*

Kirola's experts also inspected thirteen of the City's seventy-three recreation centers and clubhouses. *Id.* Mastin concluded that four of the eleven recreation centers he inspected were inaccessible, based on findings "such as inadequate signage, an excessive cross-slope leading to accessible features in a restroom, a broken elevator, and an inaccessible tennis court." *Id.*

Wood and his team inspected the same recreation centers as Kirola's experts. *Id.* at 1229. Wood testified that accessibility features at those centers included:

> (1) an accessible route from the property line to the building; (2) an accessible entry; (3) accessible community rooms; (4) accessible ramps or curb ramps where necessary; (5) accessible elevators within multi-story buildings; (6) an accessible gym with accessible bleacher facilities (with the exception of the Golden Gate Senior Center, which lacked a gym); (7) an accessible weight room in facilities where a weight room was provided; (8) accessible doors; (9) an attendant for special requests; (10) accessible

bathrooms for men and women; and (11) accessible drinking fountains.

*Id.* Wood's inspection did not come up completely clean, however. He concluded that 1.6 percent of the access barriers cited by Kirola's experts at San Francisco's recreation facilities and its libraries required modification. *Id.* at 1230. The evidence at trial similarly established that MOD had concluded that there were roughly 400 access barriers throughout the RecPark program in need of alteration. *Id.*

The district court's criticism of Kirola's experts' methods applied to their RecPark investigation as well. The district court faulted her experts for failing to consider dimensional tolerances, and criticized them for not using the "rise in run" approach to measuring slopes. *Id.* at 1222–23. Moreover, the district court found that Kirola's experts had once again applied the standards of ADAAG, which the district court concluded did not apply to parks and playgrounds. *Id.* at 1227–28. According to the district court, Kirola's experts also did not take into account conflicts between state and federal law, which in some instances "requir[ed] the City to decide which standard is more restrictive." *Id.* at 1228.

*Conclusions*. On the basis of its many critiques of Kirola's experts' methodologies, the district court ultimately found that her experts were not credible in their investigations of each public program. *See, e.g.*, *id.* at 1224. The district court gave little weight to the testimony of Kirola's experts. *See, e.g.*, *id.* By contrast, the district court found the testimony of the City's experts convincing. *See, e.g.*, *id.*

On the basis of its factual findings, the district court concluded that Kirola lacked Article III standing. The district

court ruled that Kirola's "minimal testimony" about encountering only a few barriers was insufficient to show "that she has been deprived of meaningful access to a challenged service, program, or activity in its entirety." *Id.* at 1239–40 (internal quotation marks omitted). For this reason, the district court held that Kirola had not established injury in fact. *Id.* at 1242. The district court went on to hold that even had Kirola shown an actual injury, that injury would not be redressed by the specific terms of her proposed injunction. *Id.* at 1243–45. Finally, the district court concluded that any injury to Kirola was not likely to recur because she had not shown that her alleged injuries stemmed from any written policy. *Id.* at 1249.

As an alternative holding, the district court addressed, and denied, Kirola's claims on the merits. *Id.* at 1250. Of those claims, two are relevant to this appeal. The first is a claim over "existing facilities," defined as facilities constructed prior to January 26, 1992. Under 28 C.F.R. § 35.150, the City is obligated to operate each existing facility so as to ensure "program access." *Daubert v. Lindsay Unified Sch. Dist.*, 760 F.3d 982, 988 (9th Cir. 2014). Program access does not require that each existing facility be disability accessible. *Id.* at 986. Rather, it requires that each "program" offered by the City, when viewed in its entirety, be "readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a); *Daubert*, 760 F.3d at 986. The district court held that Kirola did not prove that the City's public right-of-way, aquatics, library, and RecPark programs were inaccessible when viewed in their entirety. *Kirola*, 74 F. Supp. 3d at 1251, 1254–56.

Kirola's second relevant claim concerns facilities "newly constructed or altered" after January 26, 1992. Under

28 C.F.R. § 35.151(a)(1), each newly constructed or altered facility must be "readily accessible to and usable by individuals with disabilities." The City elected to meet this standard by following the standards set forth in ADAAG. *Kirola*, 74 F. Supp. 3d at 1212. The district court held that because it did not find Kirola's experts credible, Kirola had established only "a few isolated departures" from ADAAG. *Id.* at 1258. The district court denied Kirola's claim, reasoning that the "few variations" with respect to newly constructed or altered facilities did not show that class members had been denied "meaningful access." *Id.* at 1259.

The district court entered judgment for the City, and Kirola timely appealed. *Id.* at 1267. We have jurisdiction under 28 U.S.C. § 1291. For the reasons that follow, we affirm in part, reverse in part, and remand, with instructions.

## II

We review the district court's findings of fact following a bench trial for clear error. *See* Fed. R. Civ. P. 52(a)(6); *OneBeacon Ins. Co. v. Haas Indus., Inc.*, 634 F.3d 1092, 1096 (9th Cir. 2011). We review the district court's conclusions of law, including its conclusion regarding standing, de novo. *Id.*; *see Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1286 (9th Cir. 2013).

## III

"[T]o   satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it

is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). When seeking prospective injunctive relief, the plaintiff must further show a likelihood of future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

In the ADA context, a plaintiff may establish injury in fact to pursue injunctive relief through evidence that the plaintiff encountered an access barrier and either intends to return or is deterred from returning to the facility. *See Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 950 (9th Cir. 2011) (en banc).[3] Here, Kirola testified to encountering the following access barriers at San Francisco's public facilities:

> (1) three stretches of sidewalk containing "bumps," (2) a sidewalk where her wheelchair became stuck in a tree well; (3) one street corner that lacked curb ramps, (4) one street corner that provided only a single curb ramp, (5) errant step stools at three of the City's libraries, (6) three inaccessible pools, and (7) steep paths at one park.

---

[3] *Chapman* involved a challenge under Title III of the ADA, which addresses discrimination in public accommodations, rather than Title II, which applies to discrimination in public services. *See id.* Nevertheless, despite the titles' different application and different standards for relief on the merits, the answer to the *constitutional question* of what amounts to injury under Article III is the same.

*Kirola*, 74 F. Supp. 3d at 1240. These barriers spanned San Francisco's public right-of-way, libraries, parks, and pools, and interfered with Kirola's access at the facilities[4] she visited. *Id.*

The district court held that Kirola's experiences were insufficient to constitute Article III injury because Kirola had not "been deprived of 'meaningful access' to a challenged service, program, or activity in its entirety." *Id.* at 1239. This was error. The district court seems to have improperly conflated Kirola's standing with whether she would prevail on the merits. *See Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("Our threshold inquiry into standing in no way depends on the merits of the petitioner's contention that particular conduct is illegal." (internal quotation marks and alteration omitted)). Meaningful access to a program "in its entirety" is the standard for relief *on the merits* of Kirola's program access claims. *See* 28 C.F.R. § 35.150. If that was also the standard for injury in fact, there would be no difference between Kirola succeeding on the merits and establishing standing to assert her claims in the first place. Article III is not superfluous. Its standards exist apart from the merits, and are well established.

The standard for injury in fact is whether Kirola has encountered at least one barrier that interfered with her access to the particular public facility and whether she intends to return or is deterred from returning to that facility. *See*

---

[4] Standing for ADA claims is measured on a facility-by-facility basis, not a barrier-by-barrier basis. Once a plaintiff has proven standing to challenge one barrier at a particular facility, that plaintiff has standing to challenge all barriers related to her disability at that facility. *See Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1047 (9th Cir. 2008).

*Chapman*, 631 F.3d at 950; *see also Doran*, 524 F.3d at 1039 ("The Supreme Court has instructed us to take a broad view of constitutional standing in civil rights cases.").

Kirola meets this standard. The barriers she encountered prevented her from benefitting from the same degree of access as a person without a mobility disability, and deterred her from future attempts to access the facilities she visited. This is a concrete and particularized harm. *See Doran*, 524 F.3d at 1040 ("[Plaintiff] has suffered an injury that is concrete and particularized because he . . . personally suffered discrimination as a result of the barriers in place during his visits to 7-Eleven and that those barriers have deterred him . . . from patronizing the store"). Kirola's injuries are actual because they have already happened. And she is likely to suffer harm in the future because Kirola is "currently deterred from visiting [various public facilities] by accessibility barriers." *Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 867 (9th Cir. 2014). Kirola has established injury in fact.

Kirola has also proven causation. The barriers Kirola encountered are "fairly traceable" to the City because the City is responsible for construction, alteration, and maintenance of the facilities that include those barriers. *See Kirola*, 74 F. Supp. 3d at 1205.

Finally, Kirola has proven redressability. Through a properly framed injunction, the district court can ensure that the City alters or removes the access barriers Kirola encountered. As a result, Kirola "personally would benefit in a tangible way from the court's intervention." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 n.5 (1998) (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975)). The

district court, concluding to the contrary, focused on the specific terms of Kirola's proposed injunction, finding that the injunction would not remedy Kirola's injuries. *Kirola*, 74 F. Supp. 3d at 1243.  But Kirola's proposed injunction *would* benefit her.  For example, her proposal to shorten the City's curb ramp inspection cycle would increase the timetable in which the curb barriers she encountered would be fixed.  *See id.*

In any event, Kirola's proposed injunction does not control whether her claims are redressable.  The district court is not bound by Kirola's proposal, and may enter any injunction it deems appropriate, so long as the injunction is "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 775 (9th Cir. 2008) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Redressability is a constitutional minimum, depending on the relief that federal courts are *capable* of granting.  Kirola does not lose standing because she proposed an injunction that the district court thought too narrow.  We hold that Kirola has proven standing to challenge barriers at the facilities she visited.

We now address whether the certified class has standing to challenge the facilities Kirola did not personally visit.  A panel of our court recently clarified the relationship between Article III and class certification.  *See Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015).  Adopting the "class certification approach," the panel in *Melendres* held that "once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met."  *Id.*

(quoting 1 William B. Rubenstein, Newberg on Class Actions § 2:6 (5th ed.)).  Kirola has demonstrated individual standing to bring her claims, and the district court earlier certified a class consisting of "[a]ll persons with mobility disabilities who are allegedly being denied access . . . due to disability access barriers to . . . parks, libraries, swimming pools, and curb ramps, sidewalks, crosswalks, and any other outdoor designated pedestrian walkways in the City and County of San Francisco."[5]   The class definition is broad enough to encompass every facility discussed at trial, whether Kirola personally visited that facility or not.  The district court thought that it could address only facilities that were visited by Kirola.  But that does not take into account the scope of the certified class and the holding of *Melendres*.  We hold that the plaintiff class has standing for claims related to all facilities challenged at trial.

## IV

Turning to the merits of Kirola's claims, we address those related to newly constructed or altered facilities.  Title II's implementing regulations mandate that "each facility constructed" after January 26, 1992, be "readily accessible to and usable by individuals with disabilities."   28 C.F.R. § 35.151(a)(1).  Likewise, for "each facility altered" after January 26, 1992, the altered portion must, "to the maximum extent feasible," be "readily accessible to and usable by individuals with disabilities." *Id.* at 28 C.F.R. § 35.151(b)(1).

To ensure compliance with these mandates, a federal agency called the Architectural and Transportation Barriers

---

[5] No challenge to the class certification order is before us on this appeal.

Compliance Board ("Access Board") produces the ADAAG standards mentioned above. These standards are not binding when promulgated by the Access Board. Under Title II, the Department of Justice ("DOJ") is required to adopt its own *binding* access regulations that are consistent with the minimum standards put out by the Access Board. *See* 42 U.S.C. § 12134(b). The legal framework is that: (1) the Access Board sets a baseline of nonbinding requirements; and (2) DOJ must then adopt binding regulations that are "consistent with—but not necessarily identical to—the [Access] Board's guidelines." *Miller v. Cal. Speedway Corp.*, 536 F.3d 1020, 1025 (9th Cir. 2008).

Both ADAAG and DOJ's guidelines have been through multiple iterations since Congress passed the ADA in 1990. *See id.* at 1024–27 (giving partial history of ADAAG-related rulemakings and interpretations). The history of these regulations is a helpful key to full understanding of the requirements that govern Kirola's claims over new and altered facilities.

On July 26, 1991, the Access Board published its first iteration of ADAAG. *Id.* at 1025; *ADA Accessibility Guidelines (ADAAG)*, United States Access Board, *available at* https://www.access-board.gov/guidelines-and-standards/buildings-and-sites/about-the-ada-standards/background/adaag. That same day, DOJ adopted ADAAG in full as its own accessibility regulations. *See Background*, United States Access Board, https://www.access-board.gov/guidelines-and-standards/buildings-and-sites/about-the-ada-standards/background (hereinafter "ADAAG Background"). Through September 3, 2002, the Access Board published several supplements to ADAAG. *Id.* But because DOJ had not re-adopted ADAAG up to this

point, the supplements were nonbinding; the only binding ADAAG requirements were the original ones adopted in 1991. *See Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*, 603 F.3d 666, 674 (9th Cir. 2010) ("This court has declined to give deference to Access Board guidelines that have not yet been adopted by the DOJ.").

In 2004, the Access Board published a wholesale revamp of ADAAG. *See* ADAAG Background. Again, the new regulations were not then binding. But on September 15, 2010, DOJ updated its accessibility regulations by incorporating the 2004 ADAAG standards with slight variations. *See* 2010 ADA Standards for Accessible Design, *available at* https://www.ada.gov/regs2010/ 2010ADAStandards/2010ADAStandards.pdf; 36 C.F.R. Pt. 1191, App. B, D; 28 C.F.R. Pt. 36, App. A.

DOJ's 2010 standards set a timetable for compliance with the newly binding 2004 ADAAG standards. For new constructions or alterations commenced before September 15, 2010, public entities could choose to comply either with the original 1991 ADAAG standards or with another set of federal standards called the Uniform Federal Accessibility Standards ("UFAS"). 28 C.F.R. § 35.151(c)(1). New constructions or alterations commenced between September 15, 2010, and March 15, 2012, could comply with the 1991 ADAAG standards, with UFAS, or with the newly adopted 2004 ADAAG standards. *Id.* § 35.151(c)(2). And new constructions or alterations commenced after March 15, 2012, had to comply with the 2004 ADAAG standards. *Id.* § 35.151(c)(3).

Here, the district court found that the City had elected to follow ADAAG over UFAS to meet its federal access

obligations. *Kirola*, 74 F. Supp. 3d at 1212. Though the district court did not specify which of the two ADAAG standards the City had chosen to comply with—the 1991 or 2004 standards—we can be confident that for most new constructions and alterations it was the 1991 standard. The trial took place in April and May of 2011, a year and a half after the 2004 standards became an option for the City's new constructions and alterations. So only for facilities constructed or altered during that year-and-a-half period could the City have chosen to comply with the 2004 standards. Even then, complying with the new standard was optional, not required.

We focus our analysis on the original ADAAG standards from 1991. From here on in this opinion, when we refer to"ADAAG," we refer to the 1991 ADAAG standards.

These standards state requirements "as precise as they are thorough, and the difference between compliance and noncompliance with the standard of full and equal enjoyment established by the ADA is often a matter of inches." *Chapman*, 631 F.3d at 945–46. "[O]bedience to the spirit of the ADA does not excuse noncompliance with [] ADAAG's requirements." *Id.* at 945 (internal quotation marks omitted).

ADAAG includes two categories of requirements. The first, found in Section Four, is titled "Accessible Elements and Spaces: Scope and Technical Requirements." These requirements set out detailed design guidelines for particular features of facilities. *See, e.g.*, ADAAG § 4.9.2 ("Stair treads shall be no less than 11 in (280 mm) wide, measured from riser to riser."); *id.* § 4.13.7 ("The minimum space between two hinged or pivoted doors in series shall be 48 in (1220 mm) plus the width of any door swinging into the space.");

*id.* § 4.19.6 ("Mirrors shall be mounted with the bottom edge of the reflecting surface no higher than 40 in (1015 mm) above the finish floor."). We refer to the collection of guidelines in Section Four as the "feature-specific" requirements. The feature-specific requirements apply to "[a]ll areas of newly designed or newly constructed buildings and facilities and altered portions of existing buildings and facilities." *Id.* § 4.1.1.

The second category of guidelines is addressed not to specific features, but to specific types of facilities. We call these "facility-specific" requirements. The facility-specific requirements are spread across several different sections and give standards for particular types of facilities such as "Restaurants and Cafeterias," *id* § 5, "Medical Care Facilities," *id* § 6, and "Libraries," *id* § 8. The facility-specific sections each begin with a recital that the facilities covered by that section must still comply with the feature-specific guidelines contained in Section Four. *See, e.g.*, *id.* § 5.1.

The district court found that Kirola had proven that the City's new or altered facilities departed from ADAAG in only a few isolated instances. The district court reasoned in two steps, first concluding that *none* of Kirola's experts was reliable, and then concluding that *all* of the City's experts were reliable. *See Kirola*, 74 F. Supp. 3d at 1222, 1227–28, 1258. It thus disregarded and discarded every ADAAG violation identified by Kirola's experts, accepting only the small number of violations identified by the City's experts. *See id.* at 1230 ("Wood found that only 1.6 percent of the access barriers cited by Kirola's experts at City libraries and recreation facilities actually needed modification.").

The district court's conclusion concerning the credibility of Kirola's experts and the extent of ADAAG compliance was erroneous because it relied on several regulatory misinterpretations. The district court's most consequential misinterpretation concerned ADAAG's applicability to public rights-of-way, parks, and playground facilities. Kirola's experts applied ADAAG's standards to San Francisco's public right-of-way, parks, and playground facilities as part of their investigation of the City's compliance with the ADA. The district court sharply disagreed with this approach, explaining that in its view, ADAAG was simply inapplicable to such facilities. *Kirola*, 74 F. Supp. 3d at 1223, 1227–28. The district court based its erroneous conclusion on the fact that ADAAG in 1991 did not contain facility-specific sections for public rights-of-way, parks, and playgrounds.[6] The district court's incorrect interpretation of ADAAG contributed to its negative view of the credibility of Kirola's experts: "[t]he Court further discounts the probative value of Kirola's experts' opinions and reports based on their misapplication of ADAAG." *See Kirola*, 74 F. Supp. 3d at 1223. But because the experts had not misapplied ADAAG, and instead it was the district court that so erred, this point did not give a valid basis on which to discount Kirola's experts' testimony.

---

[6] At some point the Access Board inserted into ADAAG a placeholder heading for "Public Rights-of-Way," but the Access Board did not publish any requirements in that section. The Access Board also published an ADAAG supplement in 2002 titled "Recreation Facilities," but the supplement was not incorporated into DOJ's guidelines. *See* ADAAG §§ 14–15.

We hold that the district court's interpretation of ADAAG was erroneous.[7]  Properly interpreted, ADAAG's standards apply to public rights-of-way, parks, and playgrounds. Although ADAAG does not include facility-specific guidelines particular to those types of facilities, the Section Four feature-specific requirements apply.

Several reasons support this conclusion.  First, applying ADAAG's feature-specific requirements to public rights-of-way, parks, and playgrounds is consistent with the executive branch's own interpretation of ADAAG.  In 1993, DOJ issued a Technical Assistance Manual to help public entities understand their obligations under the ADA.  In 1994, DOJ issued a supplement to the manual that stated:

> *What if neither ADAAG nor UFAS contain specific standards for a particular type of facility?*  In such cases the technical requirements of the chosen standard should be applied to the extent possible.  If no standard exists for particular features, those features need not comply with a particular design standard.  However, the facility must still be designed and operated to meet other title II requirements, including program accessibility.

1994 Supplement to Technical Assistance Manual, II–6.2100, *available at* https://www.ada.gov/taman2up.html (emphasis

---

[7] Though we review the district court's ultimate conclusion as to witness credibility for clear error, where, as here, that credibility finding was based on a legal interpretation, we review that legal interpretation de novo.  *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 n.15 (1982).

in original) (citation omitted).  We recently held that the interpretations in this supplement are entitled to deference. *See Fortyune v. City of Lomita*, 766 F.3d 1098, 1104 (9th Cir. 2014) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *cf. Miller*, 536 F.3d at 1028 ("The guidance provided in the technical assistance manual is an interpretation of the DOJ's regulation and, as such, is entitled to significant weight as to the meaning of the regulation." (internal quotation marks omitted)).

Applying the City's "chosen standard"—ADAAG—"to the extent possible," requires applying ADAAG's feature-specific standards to San Francisco's public right-of-way, parks, and playgrounds.  As an example of what this means on the ground, while ADAAG may not have a *facility*-specific section governing parks, it does have a *feature*-specific section governing ramps.  *See* ADAAG § 4.8.  Any ramp constructed or altered in a park between January 26, 1992, and September 15, 2010 (and possibly as late as March 15, 2012), had to comply with ADAAG's feature-specific ramp guidelines.

The City focuses on the next sentence from the 1994 Supplement, that "[i]f no standard exists for particular features, those features need not comply with a particular design standard."  But that sentence applies to "features," not "facilities."  The sentence says that if, for example, Section Four had no feature-specific requirements for ramps, then any newly constructed ramps need not comply with ADAAG. This is different from saying that if there are no facility-specific requirements for parks, then parks need not comply with ADAAG at all.

Second, the language of ADAAG supports our view. The feature-specific guidelines in ADAAG Section Four, by ADAAG's own terms, apply to "[a]ll areas of newly designed or newly constructed buildings and facilities and altered portions of existing buildings and facilities." ADAAG § 4.1.1. No provision excludes application to public rights-of-way, parks, or playgrounds. Instead, ADAAG uses the broad phrase "all areas."

The City's main argument in response relies on the *expressio unius* canon of interpretation. The City contends that the presence of facility-specific sections for *some* types of facilities precludes ADAAG's application to *other* facility types that do not have their own specific set of regulations. We reject this argument, because the facility-specific sections are not standalone sets of regulations. Rather, they are collections of additions and exceptions. Consider the language at the head of each facility-specific section stating that the facility-specific requirements apply *in addition to* the feature-specific regulations of Section Four. *See, e.g.*, *id.* § 5.1. These provisions indicate that ADAAG was not structured as a regulation that applies to "apples, bananas, and oranges," permitting the reasonable inference that it does not apply to a pear. ADAAG is structured as a regulation that applies to "all fruit, but with additional rules and exception for apples, bananas, and oranges." Such a regulation would still apply to a pear. And for ADAAG, it still applies to public rights-of-way, parks, and playgrounds. For these same reasons, we are not persuaded by the district court's twist on *expressio unius* that because the Access Board has proposed facility-specific guidelines for public rights-of-way and adopted a supplement for recreation facilities, the rest of ADAAG does not apply to such facilities. *See Kirola*, 74 F.

Supp. 3d at 1223, 1227–28.  The district court's conclusion does not follow from its premise.

Third, applying ADAAG's feature-specific requirements to public rights-of-way, parks, and playgrounds makes sense as a regulatory scheme.  Imagine that ADAAG did not apply to those facilities at all.  Public entities would not suddenly find themselves free to ignore access concerns when altering or building new rights-of-way, parks, and playgrounds.  The requirements of 28 C.F.R. § 35.151 would still apply, holding public entities to the "readily accessible [] and usable" standard.  *Id.* § 35.151(a), (b).  However, the exposition of this general standard would no longer come from experts at DOJ and the Access Board, but from the courts.  In many areas of law, this is a permissible arrangement.  Giving content to general standards is foundational to the judicial function.  *See Marbury v. Madison*, 5 U.S. 137, 177 (1803).  But when the content involves many precise dimensions such as inches of knee clearance underneath a sink, *see* ADAAG § 4.24.3, courts do not have the institutional competence to put together a coherent body of regulation.  By contrast, a federal administrative agency can hire personnel with the specific skills needed to devise and implement the regulatory scheme.  And as for the regulated entities, an architect putting thousands of measurements into his or her blueprint needs a holistic collection of design rules, not the incremental product of courts deciding cases and controversies one at a time.

We hold that ADAAG applies to San Francisco's public right-of-way, parks, and playgrounds.  The district court therefore erred in its conclusion that Kirola's experts' application of ADAAG to those facilities made them less credible.  The district court should have made its credibility

assessment on the premise that ADAAG applied to those facilities.

The district court made other legal mistakes in reaching its credibility determination. For one thing, it improperly criticized Kirola's experts because they "dwelled on minor variations," rather than "focusing on overall accessibility." *Kirola*, 74 F. Supp. 3d at 1228. While, as explained below, focusing on overall accessibility is acceptable when evaluating *existing* facilities, avoiding "minor variations" is exactly what ADAAG requires of new or altered facilities. *See Chapman*, 631 F.3d at 946 (compliance with ADAAG "is often a matter of inches"). The district court's criticisms of Kirola's experts' detail-focused approach affected its assessment of those experts' credibility generally, regarding the experts' conclusions both on existing and on new or altered facilities.

The district court also improperly faulted Kirola's experts for not applying proposed federal standards for "outdoor facilities" to parks and playgrounds. *Kirola*, 74 F. Supp. 3d at 1227–28. We presume by "outdoor facilities," the district court meant ADAAG's 2002 supplement on "Recreation Facilities." *See* ADAAG § 15. The district court reasoned that because ADAAG did not apply to parks and playgrounds, the proposed standards must have been applicable. *Id.* But as already discussed, ADAAG applies to parks and playgrounds. Moreover, the 2002 supplement was not binding because DOJ never adopted the supplement as part of its own standards. *See Goddard*, 603 F.3d at 674. Kirola's experts were correct to avoid applying ADAAG's proposed standards for "Recreation Facilities" because they were not binding.

The district court further erred in criticizing Kirola's experts for their approach to measuring the slopes of curb ramps. Kirola's experts measured slope by recording the "maximum localized variation," which is the steepest individual point along the slope of a ramp. *Kirola*, 74 F. Supp. 3d at 1223. The district court thought that Kirola's experts should have instead considered the overall "rise in run," which is the average slope of the ramp. *Id.* But for a mobility-impaired user like Kirola, it is the steepest point—not the average steepness—that determines whether a particular ramp is accessible. In 2007, DOJ issued an "ADA Best Practices Tool Kit" that recognized this point, stating that "rise over run" is "not useful when assessing the accessibility of a feature that has already been constructed. . . . [I]t assumes that the slope over the length of the run is consistent, which is often an inaccurate assumption." *See* ADA Best Practices Tool Kit, Introduction to Appendices 1 and 2, *available at* https://www.ada.gov/ pcatoolkit/introapp1and2.htm. DOJ's approach in the ADA Best Practices Tool Kit is an interpretation of its own regulations, so it "is entitled to significant weight as to the meaning of the regulation." *Miller*, 536 F.3d at 1028. The district court erred in finding Kirola's experts less credible because of their approach to measuring slope. Because it is the steepest point on the ramp that affects whether a wheelchair user can navigate the ramp, it is the maximum localized variation, used by Kirola's experts, rather than the average slope, used by the City's experts, that is the correct benchmark. In any event, it was at least permissible and not a ground for discrediting Kirola's experts for them to stress maximum slope as a key to accessibility.

We are not saying that every legal interpretation by the district court affecting its credibility finding was erroneous.

For example, the district court properly faulted Kirola's experts for applying ADAAG to all curb ramps without first identifying whether those ramps were constructed or altered after January 26, 1992, thereby bringing them within ADAAG's purview.[8] *Kirola*, 74 F. Supp. 3d at 1223. The district court also correctly criticized Kirola's experts for not taking into account dimensional tolerances, for which ADAAG specifically provides.[9] *See* ADAAG § 3.2 ("All dimensions are subject to conventional building industry tolerances for field conditions."). But insofar as the district court misinterpreted applicable law, those misinterpretations led the court to an incorrect conclusion about credibility, and ultimately, to the wrong conclusion about the extent of noncompliance with ADAAG.

We are aware of and do not recede from the principle that trial court credibility findings are entitled to special

---

[8] This criticism by the district court was proper, however, only as to Kirola's claims under 28 C.F.R. § 35.151. For her claims under 28 C.F.R. § 35.150—her program access claims—compliance with ADAAG is relevant whether the facility is existing, or newly constructed or altered. This is because while the regulatory standard for claims under 28 C.F.R. § 35.150 is access on a program-wide basis, plaintiffs sometimes prove lack of programmatic access by showing that many individual barriers to access exist in the program. In evaluating these individual barriers, ADAAG's standards provide guidance. *See Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221, 226 (S.D.N.Y. 1999) ("[E]ven though only new construction and alterations must comply with the [ADAAG], those Standards nevertheless provide valuable guidance for determining whether an existing facility contains architectural barriers.").

[9] Many of ADAAG's requirements do not involve dimensions. *See, e.g.*, ADAAG § 4.8.5(1) ("Handrails shall be provided along both sides of ramp segments."). A failure to consider dimensional tolerances has no effect on the application of these requirements.

deference. *Allen v. Iranon*, 283 F.3d 1070, 1078 n.8 (9th Cir. 2002). But the district court's approach to Kirola's experts' credibility was based on legal errors. We remand for reevaluation of the extent of ADAAG noncompliance.

## V

We next address Kirola's claims related to existing facilities. Under 28 C.F.R. § 35.150(a), public entities must "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." Meeting this standard does not "[n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities." *Id.* § 35.150(a)(1). It also does not require structural changes to existing facilities, if "other methods, such as relocating services to different buildings, would be effective."[10] *Cohen v. City of Culver City*, 754 F.3d 690, 696 (9th Cir. 2014); 28 C.F.R. § 35.150(b)(1). The regulation requires only that, "when viewed in its entirety," the program at issue be accessible.

On appeal, Kirola challenges the district court's program access rulings only as to the public right-of-way and RecPark programs. She first contends that for both of these programs, the district court applied the wrong standard. Kirola points to the district court's statement that for her to prevail, each program had to be "inaccessible," or "unusable," "in its entirety." *Kirola*, 74 F. Supp. 3d at 1240, 1250. Kirola contends based on this language—and nothing more—that

---

[10] If a public entity decides to make structural changes to an existing facility, however, those changes must comply with ADAAG. *See* 28 C.F.R. § 35.150(b)(1) (citing *id.* § 35.151).

the district court required her to prove that *no part* of the City's right-of-way or RecPark programs was accessible. But we conclude that Kirola misreads the district court. By "inaccessible," or "unusable," "in its entirety," the district court appears to us to have meant inaccessible or unusable *when viewed* in its entirety.

Kirola next contends that even under the correct standard—"when viewed in its entirety"—she proved that the public right-of-way and RecPark programs were inaccessible. We disagree.

As to the public right-of-way, we agree with the district court that Kirola and the other class members' anecdotal testimony about cracked pavement, potholes, uneven sidewalks, and missing or difficult-to-use curb ramps did not establish inaccessibility at a programmatic level. *See id.* at 1251. As far as we can tell from the record, no class member testified that there were locations in the city that such class member could not reach because of access barriers.

The testimony of Kirola's experts fares no better on this particular issue. Expert Mastin inspected 1,432 curb ramps and identified 1,358 as inaccessible; expert Steinfeld conducted fourteen site inspections and found thirteen inaccessible; and expert Margen inspected ten intersections of street corners and found "major barriers to accessibility." *Id.* at 1222. But despite this partially supportive testimony, this evidence describes only a small part of the City's "approximately 2,000 miles of sidewalks, 27,585 street corners, and roughly 7,200 intersections." *Id.* at 1205. The district court also identified several problems with Kirola's experts' analysis, including that they did not consider certain "critical measurements," did not account for dimensional

tolerances, used inconsistent measurement techniques, and relied on potentially unqualified individuals to assist with surveys. *Id.* at 1222–23. Kirola has not shown that these criticisms were clearly erroneous.

Kirola's best piece of evidence for inaccessibility at a programmatic level was probably expert Seamon's graphical representation showing a map of curbs lacking ramps and curb ramps with low condition scores. *See id.* at 1224. But the district court found Seamon's representation misleading because (1) it did not show accessible curbs when they were near inaccessible ones, and (2) it relied on outdated data. Kirola has not shown that these findings were clearly erroneous either.

Finally, the trial record included evidence that the City's Municipal Transportation Agency provides both public transportation and paratransit services as part of the public right-of-way. *Id.* at 1205. The paratransit service in particular includes van and taxi service for disabled individuals. *Id.* The public transportation and paratransit services are the sorts of "other methods" that can satisfy program access even if other particular methods of benefitting from the program are inaccessible. 28 C.F.R. § 35.150(b)(1); *see Daubert*, 760 F.3d at 988 (holding that high school football games met program access standard where bleachers were inaccessible but other accessible locations provided unobstructed views of the field). In sum, we conclude that Kirola has not shown that the City operates its public right-of-way in a deficient manner so that the program, when viewed in its entirety, is not readily accessible to and usable by individuals with disabilities.

We reach the same conclusion regarding San Francisco's RecPark program. Kirola and the other class members testified to encountering barriers at some parts of various parks. *Kirola*, 74 F. Supp. 3d at 1219–20. But their anecdotal experiences do not establish that the RecPark program, consisting of 220 parks and 400 structures, is inaccessible when viewed in its entirety. Kirola's experts inspected 13 parks, 7 mini-parks, and 16 playgrounds, finding access barriers at many of them. *Id.* at 1227. But their analysis still covered only a small fraction of the City's total park offerings. The same goes for her experts' analysis of recreation centers and clubhouses, where they inspected only thirteen of the City's total seventy-three. *Id.* Moreover, after expert Mastin inspected eleven recreation centers, he concluded that only four were inaccessible. *Id.*

The City does not dispute that its parks contain some access barriers. MOD at one point concluded that the RecPark program contained roughly 400 such barriers. *Id.* at 1230. But the presence of these barriers does not establish that the RecPark program was inaccessible when viewed as a whole. We sympathize with the frustration of mobility-impaired individuals who may show up to many of San Francisco's parks and then find themselves shut out. But perfect accessibility is not the applicable standard under 28 C.F.R. § 35.150. We also note that the City operates a website that gives information on the accessibility of its various parks, information that can help disabled persons plan which parks to visit.

Kirola argues that certain parks offer unique benefits, and that when those parks are inaccessible, the existence of other, accessible parks does not provide an adequate substitute. For example, she asserts that Golden Gate Park provides

inaccessible benefits such as a Model Yacht Clubhouse, a Rose Garden, and a Shakespeare Garden, among other amenities, that are unique to Golden Gate Park. But program access does not operate at such a narrow level of review. *See Daubert*, 760 F.3d at 988. There may be something unique about every park and every facility. But 28 C.F.R. § 35.150 requires only that the program as a whole be accessible, not that all access barriers—and not even all of those at the most iconic locations—be remedied.

Finally, Kirola contends that the City's own definition of an "accessible park" is too lenient to ensure meaningful access. On the RecPark website, the City defines an "accessible park" as one that has an "accessible entry" and "at least one accessible recreational opportunity." *Kirola*, 74 F. Supp. 3d at 1216. But as the district court recognized, the City does not use this definition as its standard for ensuring program access. *Id.* at 1263. Rather, the City uses the definition as part of its effort to inform disabled individuals about which parks they may or may not be comfortable visiting. The above considerations lead us to conclude that Kirola has not met her burden of proving a lack of program access to the City's park system.

At bottom, Kirola's program access claims fail for lack of proof. She did not present evidence sufficient to show that the City's public right-of-way and RecPark programs, when viewed in their entirety, were not readily accessible to and usable by individuals with disabilities. The district court properly rejected Kirola's program access claims. We affirm the district court's program access holdings.

## VI

In sum, we hold that the district court's credibility determinations were based on legal errors and that its conclusion regarding the scope of ADAAG noncompliance was erroneous.  We also hold that the district court properly concluded that Kirola had not proven program access violations.   On remand,[11] the district court shall apply ADAAG as we have interpreted it, and reevaluate the extent of ADAAG noncompliance.  Once the scope of any ADAAG violations at facilities used by Kirola and all other class members has been determined, the district court shall revisit the question of whether injunctive relief should be granted in light of the scope of violations determined by the district court, and the Supreme Court's required standards.  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010);

---

[11] Kirola requests that this case be reassigned on remand.  She contends that reassignment is necessary because (1) the district court, in her view, focused almost entirely on the City's arguments to the exclusion of her own, and (2) more than three-and-a-half years passed between the close of trial and the district court's decision.  We decline to reassign this case.  Though the district court erred in its conclusion regarding the extent of facilities out of compliance with ADAAG, the district court did not display partiality, and we have no reason to believe that it will not faithfully apply our instructions on remand.  Moreover, the substantial period between the end of trial and the district court's decision was consumed with post-trial briefing, not needless delay.  This case does not present the sort of "rare and extraordinary circumstances" that merit reassignment.  *Krechman v. Cty. of Riverside*, 723 F.3d 1104, 1112 (9th Cir. 2013) (internal quotation marks omitted).

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).[12]

The parties shall bear their own costs on appeal.

**AFFIRMED in part, REVERSED in part, and REMANDED, with instructions.**

---

**[12]** There are two motions currently pending in our docket, The Motion to Exceed the Type Volume Limitation for Brief of Amicus Curiae, The Legal Aid Society – Employment Law Center, filed with this court on November 9, 2015, and Appellants' Request for Judicial Notice, filed with this court on July 15, 2016.  Both motions are **GRANTED**.