**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CHRIS LANGER,
     *Plaintiff-Appellant,*

  v.

MILAN KISER, in individual and
representative capacity as trustee of
the Milan and Diana Kiser Revocable
Trust dated August 19, 2003; DIANA
KISER, in individual and
representative capacity as trustee of
the Milan and Diana Kiser Revocable
Trust dated August 19, 2003,
          *Defendants-Appellees,*

 and

FRANK P. ROFAIL; DAVID
MATTHEW TAYLOR; DOES, 1-10,
         *Defendants.*

No. 21-55183

D.C. No.
3:18-cv-00195-
BEN-AHG

OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted March 18, 2022
San Francisco, California

Filed January 23, 2023

Before: William A. Fletcher, Ronald M. Gould, and Daniel P. Collins, Circuit Judges.

Opinion by Judge Gould;
Dissent by Judge Collins

## SUMMARY[*]

### Americans with Disabilities Act

The panel reversed the district court's judgment, after a bench trial, in favor of defendants Milan and Diana Kiser and vacated the district court's award of costs in an action brought by Chris Langer under Title III of the Americans with Disabilities Act.

Title III prohibits places of public accommodation from discriminating against people on the basis of disability, and the ADA Accessibility Guidelines require parking lots of a certain size to have van-accessible spaces with access aisles.

The Kisers rented their property to commercial tenants. Langer tried to visit two businesses on the property, the Gour Maine Lobster (the "Lobster Shop") and the 1 Stop Smoke Shop. One of the Kisers' tenants, David Taylor, owned the Lobster Shop. Taylor's lease assigned him a space in the parking lot on the property for his personal

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

use. Taylor placed a "Lobster Shop Parking Sign" near his assigned space. The Kisers asked Taylor to remove the sign, but he did not do so. Because the parking lot did not have a van-accessible parking space, Langer could not access either business when he visited the property.

First, the panel held that Langer had Article III standing to bring his claim for injunctive relief under Title III of the ADA. The panel held that, to establish standing, a plaintiff suing a place of public accommodation must show actual knowledge of an access barrier or ADA violation and must show a sufficient likelihood of injury in the future. The panel also held that so-called "serial litigants" can have tester standing to sue for Title III violations because a plaintiff's motive for going to a place of public accommodation is irrelevant to standing. Thus, the fact that Langer was a serial litigant had no place in the panel's standing analysis. His testimony at trial, however, was relevant to the standing inquiry because he was required to demonstrate an intent to return to the Lobster Shop or current deterrence from returning, and thus a likelihood of injury in the future.

The panel rejected the district court's adverse credibility determination regarding Langer's trial testimony because the court relied on his motivation for going to the Lobster Shop and his ADA litigation history. The panel held that Langer met his burden to establish standing because he demonstrated that he was currently deterred from patronizing the Lobster Shop because of its inaccessibility and that he intended to return as a customer once the store provided accessible parking. The panel held that district courts cannot use the doctrine of standing to keep meritorious ADA cases out of federal courts simply because they are brought by serial litigants. Nor can district courts

use improper adverse credibility determinations to circumvent this court's holding allowing tester standing for ADA plaintiffs. The panel held that courts must take a broad view of standing in civil rights cases, particularly in the ADA context where private enforcement is the primary method of securing compliance with the act's mandate.

The panel next held that the district court erred in ruling that Langer did not establish an ADA violation because the Lobster Shop's parking lot "was not a place of public accommodation." Title III of the ADA provides that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." Looking to the statutory text, as well as the regulations implementing the ADA, the panel held that the district court erred as a matter of law by analyzing whether the parking lot itself was a "place of public accommodation" rather than whether it was a "facilit[y] . . . of any place of public accommodation." The panel determined that the parking lot was a facility and was not itself a place of public accommodation. Thus, the question was whether the Kisers discriminated against Langer on the basis of his disability by not offering a van-accessible parking space in their parking lot.

The panel held that, to determine whether a facility is open to the public, and thus subject to the requirements of Title III, courts must rely upon the actual usage of the facility in question. Absent information about actual usage, considerations such as the nature of the entity and the facility, as well as the public's reasonable expectations regarding use of the facility, may further guide a court's analysis. Because actual usage was the key, the district court

erred by giving controlling weight to the terms of the lease agreement between the Kisers and Taylor, to determine whether there was an ADA violation. The panel concluded that overwhelming evidence at trial, including Taylor's testimony, showed that the parking lot was, in fact, open to customers of the Lobster Shop. The panel therefore reversed the entry of judgment for the Kisers and remanded with instructions for the district court to enter judgment for Langer.

Finally, the panel held that the district court did not err in denying Langer's motion to strike a trespass counterclaim pursuant to California's anti-SLAPP statute, which allows for the pre-trial dismissal of certain actions "intended primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." The panel held that the fact that Langer waited until after trial to appeal the denial of his motion to strike did not deprive the court of appeals of jurisdiction, even though the denial of an anti-SLAPP motion is an immediately appealable collateral order. The panel held that Langer met his burden of a threshold showing that approaching the Kisers' property to assess ADA compliance was an act in furtherance of Langer's right to petition under the First Amendment. The Kisers, however, established a reasonable probability of prevailing on the trespass claim. Accordingly, the district court did not err in denying Langer's anti-SLAPP motion. The district court, however, erred in ruling that Langer committed a trespass because the district court declined supplemental jurisdiction over the trespass claim and therefore lacked jurisdiction to rule on it. The panel therefore vacated the district court's legal holding regarding the trespass claim.

Dissenting, Judge Collins wrote that the district court properly found that Langer was not a credible witness in light of his less-than-trustworthy demeanor, the stark inconsistencies in his testimony and past statements, and the implausibility of some of his claims. Accordingly, the district court did not clearly err in its factual finding that, in light of that credibility determination, Langer did not have any intention of returning to and patronizing the Lobster Shop. Judge Collins wrote that Langer therefore lacked Article III standing to seek prospective injunctive relief, the only remedy available in a private suit under the ADA. Judge Collins would affirm the dismissal of Langer's ADA claim with prejudice, but only on the threshold ground that Langer failed to prove Article III standing. In addition, because the district court lacked jurisdiction over the only federal claim in the case, it did not abuse its discretion in declining to exercise supplemental jurisdiction over the remaining state law claims.

## COUNSEL

Dennis J. Price II (argued), Center for Disability Access, San Diego, California; Russell C. Handy, Potter Handy LLP, San Francisco, California; for Plaintiff-Appellant.

Samy S. Henein (argued), Suppa Trucchi & Henein LLP, San Diego, California, for Defendants-Appellees.

# OPINION

GOULD, Circuit Judge:

Chris Langer is a paraplegic man, disability advocate, and serial litigant. Langer cannot walk, so he uses a wheelchair to get around and drives a van that deploys a ramp from the passenger side. For Langer to park and exit his vehicle, a parking lot must have an accessible parking space with an adjacent access aisle. Title III of the Americans with Disabilities Act of 1990 ("ADA") prohibits places of public accommodation from discriminating against people on the basis of disability, 42 U.S.C. § 12182, and the ADA Accessibility Guidelines ("ADAAG") require parking lots of a certain size to have van-accessible spaces with access aisles. ADAAG § 208.1; 502.1 (2010) (codified at 28 C.F.R. pt. 36, subpart D and apps. B and D). When Langer comes across a place that he believes is not compliant with the ADA, he takes photos to document the condition of the premises and often sues. Langer is a "serial" ADA litigant, a fact featured prominently at trial, and he has filed close to 2,000 ADA lawsuits in the thirty-two years since Congress enacted the ADA.

This appeal arises from one such lawsuit. The central question we must answer is whether a place of public accommodation violates the ADA by opening up its private parking lot to customers without making it accessible to customers with disabilities. Because the business owner in this case testified that he allowed customers to park in the parking lot, we must reverse the district court's judgment in favor of the defendant property owners, regardless of what the terms of their lease with the business owner specified. A business cannot offer parking to customers without

disabilities while not offering that same benefit to customers with disabilities—that discrimination goes to the heart of the ADA. A second question raised by this appeal is whether a district court may rely on a plaintiff's litigation history to question his credibility and intent to return to a place of public accommodation. We hold that a district court may not reject an ADA litigant's stated intent to return to a location simply because the litigant is a serial litigant who brings numerous ADA cases.

## I.  BACKGROUND

Defendants Milan and Diana Kiser own a mixed-use real estate property near Langer's home in San Diego and rent it to residential and commercial tenants. In September 2017, Langer tried to visit two businesses on the property: the Gour Maine Lobster (the "Lobster Shop") and the 1 Stop Smoke Shop (the "Smoke Shop").

One of the Kisers' tenants, David Taylor, owns the Lobster Shop. The lease between the Kisers and Taylor assigned Taylor a space in the parking lot for his personal use. Taylor placed a sign near his assigned parking space with the words "lobster" and "parking" to "show customers where the store is, where to go, and where to park." At some point, Kiser noticed Taylor's "Lobster Shop Parking Sign" and asked Taylor to remove it, but Taylor did not do so.

Because the parking lot on the Kisers' property did not have a van-accessible parking space, Langer could not access either business when he visited the property. Langer sued the Kisers over the lack of accessible parking, bringing claims under Title III of the ADA and California's Unruh

Civil Rights Act, Cal. Civ. Code §§ 51–53.[1]  The Kisers filed a trespass counterclaim against Langer.

The district court held a one-day bench trial and at its conclusion entered judgment for the Kisers.  The district court first held that Langer had standing to bring this action, although it did so "reluctantly," doubting that Langer had a "legitimate" intent to return.  It concluded that Langer's testimony was unreliable because of his extensive litigation history as an ADA litigant.  Reaching the merits of Langer's ADA claim, the district court entered judgment in favor of the Kisers, holding that the parking lot they owned was not a place of public accommodation. Despite contrary testimony from the Lobster Shop owner, Taylor, that his customers parked in the parking lot, the district court instead relied upon the lease, which stated that the parking spot was for Taylor.[2]  Relying on that term, the district court concluded that all members of the public were denied access to the parking lot, not only people with disabilities.

---

[1] Langer sued the Kisers in their individual and trustee capacities.  He also sued the respective business owners of the two stores, but the parties agreed to dismiss the business owners as defendants before trial.

[2] Paragraph 8 of the "Rental Agreement And/Or Lease" between Kiser and Taylor provides:

> When and if RESIDENT is assigned a parking space on OWNER's property, the parking space shall be used exclusively for parking of passenger automobiles and/or those approved vehicles listed on RESIDENT's 'Application to Rent/Lease' or attached hereto. RESIDENT is hereby assigned parking space ONE. Said Space shall not be used for the washing, painting, or repair of vehicles.  No other parking space shall be used by RESIDENT or his guests.

We have jurisdiction under 28 U.S.C. § 1291. We reverse the district court's holding that the parking lot was not a place of public accommodation, and we vacate the district court's costs award.

## II. STANDING

We first examine standing because we have an independent duty to do so before turning to the merits. *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 868 (2002). In this case, however, Langer's testimony at trial is relevant to whether he has standing, so our standing analysis proceeds in several steps. We first provide an overview of standing in the ADA Title III context. We next examine the district court's credibility determination against Langer. We then determine, on *de novo* review, whether Langer has standing.

## A.

Because Article III limits our jurisdiction to cases and controversies, the "irreducible constitutional minimum of standing" requires a plaintiff to have suffered an injury in fact, caused by the defendant's conduct, that can be redressed by a favorable result. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The elements of causation and redressability are not contested, so we need to evaluate only Langer's asserted injury in fact. To confer standing, an injury in fact must be concrete, particularized, and actual or imminent, not hypothetical. *Id.* Although a plaintiff must establish standing at each stage of the litigation, *id.* at 561, whether a plaintiff has standing depends upon the facts "as they exist when the complaint is filed," *id.* at 569 n.4 (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989)).

Private plaintiffs are limited to seeking injunctive relief under Title III of the ADA, so a plaintiff suing a place of public accommodation must show a sufficient likelihood of injury in the future to establish standing. *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004). Encountering ADA violations at a place of public accommodation in the past is not itself sufficient for standing, though it provides some evidence supporting the likelihood of future harm. *Id.*

Our understanding of what standing requires in the ADA Title III context has evolved over time. In *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133 (9th Cir. 2002), we established what became known as the deterrent effect doctrine for ADA standing. There, a plaintiff brought an ADA action against a grocery store, but the district court dismissed it for lack of standing because the plaintiff had not attempted to enter the store during the statute of limitations period. *Id.* at 1135. We reversed, holding that to bring an ADA claim against a place of public accommodation, it is enough for a plaintiff to have actual knowledge of accessibility barriers there. *Id.* Quoting from Title III, we confirmed that a person with a disability need not engage in the "futile gesture" of trying to access a noncompliant place just to create an injury for standing. *Id.* Rather, to establish a cognizable future injury, all a plaintiff needs to do is be "currently deterred" from visiting the place of public accommodation because of the accessibility barriers. *Id.* at 1138.

We next examined standing in a pair of ADA cases where plaintiffs sued places of public accommodation far from their homes. In *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1040–41 (9th Cir. 2008), we held that the plaintiff had standing to sue a convenience store 500 miles from where he

lived because he was "currently deterred" from visiting the store due to the barriers he encountered.  We added that the ongoing uncertainty about whether the barriers remain is "itself an actual, concrete and particularized injury under the deterrence framework of standing articulated in *Pickern*." *Id.* at 1043.  We held that the plaintiff had standing to challenge not just the barriers he personally encountered, but also other barriers related to his disability that he became aware of through discovery.  *Id.* at 1043–44.

We reached a similar conclusion in *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1034–39 (9th Cir. 2008) and held that a plaintiff had standing to challenge ADA violations at a hotel she stayed at in Santa Barbara, far from her home in Sacramento.   D'Lil worked as an accessibility consultant and traveled around California evaluating properties for ADA compliance.  *Id.* at 1034.  The district court doubted that she had a "legitimate" intent to return because of her involvement in so many ADA lawsuits, and it dismissed her case for lack of standing.  *Id.* at 1035. We reversed, clarifying that when the place of public accommodation is far from a plaintiff's home, a plaintiff can establish standing by demonstrating "an intent to return to the geographic area where the accommodation is located and a desire to visit the accommodation if it were made accessible.  *Id.* at 1037 (citing *Pickern*, 293 F.3d at 1138). Reviewing the record evidence, we concluded that her declaration and testimony "plainly evidence[d]" an intent to return.  *Id.* at 1039.  We also rejected the district court's adverse credibility finding against the plaintiff because it used her past ADA litigation to doubt her intent to return. *Id.* at 1040.

We further clarified our standing jurisprudence for claims brought under Title III of the ADA in *Chapman v.*

*Pier 1 (U.S.) Imports Inc.*, 631 F.3d 939 (9th Cir. 2011) (en banc). In *Chapman*, a disabled plaintiff sued a retail store because of barriers encountered on past visits, as well as for barriers not personally encountered. *Id.* at 943. The plaintiff admitted that he was not deterred from visiting the store because of the barriers, but he testified that he intended to return to the store and believed the barriers would impede his access. *Id.* We held that current deterrence is sufficient but not necessary for standing, and that plaintiffs with knowledge of an ADA violation at a place of public accommodation can establish a sufficient future injury for standing by either (1) showing that they are currently deterred from returning to the place of public accommodation because of a barrier, or (2) showing that they were previously deterred and intend to return to the non-compliant place of public accommodation. *Id.* at 944. We ultimately held that the plaintiff in *Chapman*, however, did not have standing because he did not describe with specificity the barriers he encountered. *Id.* at 954.

Most recently, we revisited the standing requirements for plaintiffs suing under Title III of the ADA in *Civil Rights Education and Enforcement Center v. Hospitality Properties Trust* ("*CREEC*"), 867 F.3d 1093 (9th Cir. 2017). There, plaintiffs brought a class action alleging that hotels across the country provided shuttle transportation to guests without disabilities but did not provide equivalent wheelchair-accessible transportation for guests who use wheelchairs. *Id.* at 1096–97. The named plaintiffs in *CREEC* had not actually visited any of the hotels and instead made calls to inquire about the availability of accessible transportation. *Id.* at 1097. We first held that a plaintiff need not visit the place of public accommodation or personally encounter a barrier in order to suffer an injury in fact. *Id.* at 1099–1101.

That the plaintiffs had called the hotels and learned that they did not offer accessible transportation was enough. *Id.* And we again affirmed that a plaintiff must allege "continuing, present adverse effects" but can do so through either the "deterrent effect doctrine" or by showing an intent to return "when the non-compliance is cured." *Id.* at 1099–1100.

We also held, for the first time, that a plaintiff suing under Title III of the ADA can establish standing through being a tester plaintiff. *Id.* at 1101. We concluded that a plaintiff's motivation for visiting a place of public accommodation is "irrelevant to the question of standing." *Id.* Drawing upon the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), in which it recognized tester standing under the Fair Housing Act, we noted that Congress used the same "any person" language in Title III of the ADA as it did in the Fair Housing Act. *Id.* at 1101–02. This broad language, allowing "any person" to bring a claim under Title III of the ADA, indicated to us that Title III did not contain a "bona fide" customer requirement for standing. *Id.*; *see also* 42 U.S.C. § 12188(a)(1).

So where does that leave us? We know that a plaintiff bringing a claim under Title III of the ADA must have actual knowledge of an access barrier or ADA violation. *Pickern*, 293 F.3d at 1135. But the plaintiff need not personally encounter the barrier or physically visit the place of public accommodation. *CREEC*, 867 F.3d at 1100. And we know that an ADA plaintiff has standing to sue for all barriers, even ones that surface later during discovery, as long as those barriers relate to the plaintiff's specific disability. *Doran*, 524 F.3d at 1047; *Chapman*, 631 F.3d at 950–53. But because private plaintiffs are limited to injunctive relief under Title III, encountering an ADA violation in the past at a place of public accommodation is not enough. *Fortyune*,

364 F.3d at 1081. Instead, a plaintiff must establish a sufficient future injury by alleging that they are either currently deterred from visiting the place of public accommodation because of a barrier, or that they were previously deterred and that they intend to return to the place of public accommodation, where they are likely to reencounter the barrier. *Chapman*, 631 F.3d at 944. Finally, we know that so-called "professional plaintiffs," "paid testers," or "serial litigants" can have tester standing to sue for Title III violations because a plaintiff's motive for going to a place of public accommodation is irrelevant to standing. *See CREEC*, 867 F.3d at 1102.

**B.**

Langer is one such serial litigant, having filed nearly 2,000 ADA lawsuits in federal and state courts. This fact has no place in our standing analysis. *CREEC*, 867 F.3d at 1102. Instead, we may only consider whether Langer has actual knowledge of a barrier or ADA violation at the Lobster Shop and whether he can establish a sufficient future injury for the injunctive relief he seeks.

Because Langer must demonstrate an intent to return to the Lobster Shop or current deterrence from returning to the Lobster Shop in order to establish a sufficient future injury, his testimony at trial is relevant to the standing inquiry. The district court expressed concerns about Langer's credibility throughout its opinion and found his testimony to be unreliable. To the extent that these concerns amount to an adverse credibility determination, we reject it. Although we give "great deference to district court findings relating to credibility," we may "reject its ultimate determination" if the district court relied upon impermissible legal reasoning or inferences. *D'Lil*, 538 F.3d at 1035, 1039–40 (citation and

alteration omitted); *see also Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1182 (9th Cir. 2017) (rejecting a district court's credibility determination in the ADA context where it "was based on legal errors"). We reject the district court's "ultimate determination" regarding Langer's credibility because it relied on Langer's motivation for going to the Lobster Shop and his ADA litigation history, contrary to *D'Lil* and *CREEC*. For the following reasons, the district court's credibility determination cannot stand.

**1.**

First, the district court's credibility determination contravenes our holding in *D'Lil*. There, the district court dismissed the plaintiff's action for lack of standing, expressing doubt that the plaintiff had a "legitimate" intent to return because of her involvement in so many previous ADA lawsuits. *Id.* at 1035. We rejected the district court's adverse credibility determination because it "focused on D'Lil's history of ADA litigation as a basis for questioning the sincerity of her intent to return." *Id.* at 1040. Warning that we "must be particularly cautious about affirming credibility determinations that rely on a plaintiff's past ADA litigation," we explained that because the ADA limits suits brought by private plaintiffs to injunctive relief and does not allow suits for damages, most ADA lawsuits are brought by serial litigants. *Id.* at 1040. We commented that it may be "necessary and desirable for committed individuals to bring serial litigation advancing the time when public accommodations will be compliant with the ADA." *Id.* at 1040 (quoting *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007) (citing Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 U.C.L.A. L. Rev. 1, 5 (2006))).

Here, as in *D'Lil*, the district court focused on Langer's past ADA litigation to impugn his credibility, expressing doubt that Langer would return to the Lobster Shop expressly *because of* the previous lawsuits he filed. The district court emphasized that Langer "has been a plaintiff in 1,498 federal lawsuits" over the last eighteen years and this "extensive litigation history" coupled with his inability to remember details about the businesses involved in those lawsuits weighed against the credibility of his stated intent to return to the Lobster Shop. But, as in *D'Lil*, the record does not contain information about whether the places of public accommodation in Langer's previous cases were made accessible. *Id.* at 1040. Nor does the record contain information about whether Langer actually returned to those places, and the defense did not ask him if he had. Instead, the defense only asked him whether he had alleged an intent to return in his previous complaints, which he had.

Langer's intent to visit unrelated places he previously sued "says little" about his intent to visit the Lobster Shop, *D'Lil*, 538 F.3d at 1040, particularly in light of its proximity to his house, his professed taste for lobster, and that he returned to the premises since filing the lawsuit to assess its compliance with the ADA. His inability to recall details from other lawsuits without any opportunity to refresh his memory—for example, which specific items he picked up three years earlier from an auction house that he sued—does not shed light on his intent to return to the Lobster Shop. And Langer's work as an accessibility advocate, like the plaintiff in *D'Lil*, undermines the district court's "speculation about the plausibility" of his intent to return to the Lobster Shop. *Id.* His several return visits to the premises remove any doubt.

**2.**

Nor does the sheer number of Langer's previous lawsuits provide grounds for doubting his intent to return. In questioning Langer's credibility, the district court emphasized that Langer filed "six (6) other lawsuits" on the same day he filed this lawsuit. At trial, Langer's counsel confirmed that he filed six lawsuits on Langer's behalf in one day. But examining those complaints, which were entered into trial as exhibits, dispels any credibility concern. The complaints reveal that Langer visited one defendant (a bank) in September 2017, two defendants (a tree nursery and an auto body shop) in October 2017, two others (a marijuana dispensary and an auction shop) in November 2017, and the final defendant (a shopping center) in December 2017. Langer's history and frequency of visiting places of public accommodation shows nothing more than Langer going about his ordinary course of business and gives no reason to think that he would be unable to return to these establishments in the future. The district court was wrong to rely upon the number of complaints Langer's lawyer chose to file in one day on his behalf to question the reliability of Langer's testimony at trial.

**3.**

The district court also relied upon Langer's decision to forgo claims related to the Smoke Shop, the Lobster Shop's neighboring business, in questioning his intent to return to the Lobster Shop. This proves nothing. When Langer filed his complaint, the Kisers' property was home to two businesses: the Lobster Shop and the Smoke Shop. Langer initially challenged accessibility barriers at both establishments but stipulated at trial that he was foregoing claims against the Smoke Shop. His counsel explained that

because Langer was only challenging the lack of accessible parking, and the Kisers owned the lot for both properties, it was redundant to pursue a separate claim challenging the lack of accessible parking at the Smoke Shop.

Despite appearing to accept this explanation at trial, the district court used Langer's decision against him in making its adverse credibility finding, reasoning that Langer's decision to forego the Smoke Shop claim "directly undercuts his credibility with respect to having a legitimate intent to return to the Property." The district court further noted that Langer "never alleged that he smoked, and as such, a *legitimate* intent to return to the Smoke Shop would be suspect" absent an expressed interest in smoking. Consequently, the district court found it "[n]ot surprising[]" that Langer stipulated to foregoing these claims. The district court committed legal error by concluding that Langer's "professed intent to return" was not credible and finding "[t]o the contrary" that Langer's "purpose in visiting the Property was to identify potential ADA violations." This part of the district court's credibility analysis is riddled with impermissible reasoning in the wake of our decision in *CREEC* permitting tester standing for ADA claims. Being an ADA tester is, in fact, a legitimate reason to go to a business, *see* 867 F.3d at 1101–02, and the district court's insinuation otherwise is legally flawed. Visiting the property to identify potential ADA violations is consistent with having a credible intent to return; in other words, credibility is not mutually exclusive with being a tester. *See id.* For this reason, we expressly reject the "Harris Test" relied upon by this district court and others in the circuit that attempts to measure the legitimacy of a plaintiff's intent to return by considering factors such as the plaintiff's "past patronage of defendant's business." *Harris v. Del Taco,*

*Inc.*, 396 F. Supp. 2d 1107, 1113 (C.D. Cal. 2005); *see also Harris v. Stonecrest Care Auto Ctr., LLC*, 472 F. Supp. 2d 1208, 1216 (S.D. Cal. 2007). There is no past patronage or bona fide customer requirement to bring an ADA claim. *CREEC*, 867 F.3d at 1102. The Harris Test cannot coexist with *CREEC*, and we have not adopted it since it was first articulated over fifteen years ago. The district court's suggestion that the Ninth Circuit endorses this test is flat wrong.

Along the same line of reasoning, the district court opined that if Langer "truly desired to make the premises handicap accessible for others as well as himself, he would not have foregone claims pertaining to the Smoke Shop." Though it may be "desirable for committed individuals to bring serial litigation advancing the time when public accommodations will be compliant with the ADA," *D'Lil*, 538 F.3d at 1040 (quoting *Molski*, 500 F.3d at 1062), ADA testers need not take every claim to trial in order for their intentions to be credible. Holding claims that ADA testers decide to forego against them (while also criticizing them for the amount of claims they have brought in the past) puts disability advocates in an impossible position and can have a chilling effect on accessibility litigation.

We reject the district court's credibility determination against Langer because it rests on impermissible legal reasoning, *D'Lil*, 538 F.3d at 1040, *Kirola*, 860 F.3d at 1185, and leaves us with a "definite and firm conviction" that the district court made a mistake, *United States v. Elliott*, 322 F.3d 710, 715 (9th Cir. 2003) (quoting *United States v.*

*Maldonado*, 215 F.3d 1046, 1050 (9th Cir. 2000)).[3]   The district court directly and repeatedly used Langer's extensive litigation history to question the sincerity of his intent to return in violation of *D'Lil*, and its supporting, ancillary findings rely upon flawed reasoning that we cannot, and should not, accept.

We do not read *D'Lil* as imposing an outright prohibition on making credibility determinations against serial litigants, and district courts ought not interpret our opinion today to endorse that view.  A court may still make a credibility determination against a serial litigant, but there must be something other than the fact that the litigant files a lot of ADA cases to instill doubt in his testimony.  For instance, if a plaintiff alleged that he broke his leg multiple times in one day from the same barrier at different locations, a court would be prudent to question his credibility. *Cf. Molski*, 500 F.3d at 1051–52.  Or, if Langer had alleged personally encountering inaccessible parking at businesses in California, Hawaii, and Alaska on the same day, an adverse credibility determination would be well taken.  But merely driving around, documenting ADA noncompliance, and filing multiple lawsuits is not in and of itself a basis for being found noncredible.  Our precedent demands more.

---

[3] We find *D'Lil* to be the most instructive case on credibility determinations in the ADA context and follow its procedure.  There, we rejected outright the district court's credibility determination against the serial litigant and remanded so that the district court could consider the merits of the plaintiff's motion for attorney's fees, which it had not considered because it dismissed the motion based on lack of standing. 538 F.3d at 1040–41.  Here, because the district court found that Langer has standing—a conclusion we agree with on *de novo* review—and reached the merits of Langer's ADA claim, we need not remand for the district court to consider the merits in the first instance after rejecting its credibility determination.

## C.

After rejecting the district court's credibility determination because it rests on legal error, we now consider whether Langer has standing, "a question of law that we review de novo." *D'Lil*, 538 F.3d at 1035. Despite its credibility determination, the district court repeatedly concluded that Langer had standing, summarizing that "while Plaintiff has Article III standing, the subject property . . . was not a place of public accommodation," and including in its legal conclusions that "Plaintiff has standing to pursue his ADA claims." The district court concluded that Langer "has standing on the basis that he encountered a barrier on the date of his visit," noting that Langer "stated he intended to return both in his complaint as well as at trial." Notwithstanding its multiple statements that Langer had standing, the district court explained that it "arrive[d] at this conclusion reluctantly, and only . . . by following the Ninth Circuit's instructions to liberally construe standing in ADA cases." We hold that Langer has standing to bring this action.

## 1.

We start with the facts as they existed when Langer filed his complaint. Langer personally encountered the lack of accessible parking when he visited the Lobster Shop in September 2017 and sufficiently described this barrier in his complaint, satisfying the actual knowledge requirement for standing. *See Chapman*, 631 F.3d at 954. As for deterrence or intent to return, Langer alleged in his complaint that he would like to return to the Lobster Shop "but will be deterred from visiting until the defendants cure the violations." He claimed that he "is and has been deterred from returning" to the Lobster Shop as a customer, but that he "will,

nonetheless, return to the business to assess ongoing compliance with the ADA."  Langer also affirmed that he "will return to patronize" the Lobster Shop "as a customer once the barriers are removed."

At trial, Langer testified on direct examination that he went to the Lobster Shop in September 2017 for lobster, a food that he likes.  He submitted into evidence the 52 photos he took during this visit, documenting the accessibility barriers that existed at the time he filed his complaint.  On cross-examination, he testified that he has been back to the Lobster Shop premises four or five times since filing the lawsuit, and most recently he went there the night before trial.  He lives ten minutes from the store.

While standing "ordinarily depends" on the facts that exist at the time the complaint is filed, *Lujan*, 504 U.S. at 569 n.4, Langer stated in his complaint that he intends to return to the Lobster Shop, and his repeated return visits support that fact.  Because the defense attempted to impeach his stated intent to return at trial, we may properly consider his return visits as evidence of his intent to return.  *See id.* at 561 ("[A]t the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.") (internal quotation marks omitted); *see also D'Lil*, 538 F.3d at 1038–39 (considering the plaintiff's testimony that she visited the area after filing the complaint as evidence of her intent to return, which was the "obvious and most reasonable inference" from her testimony).

That Langer returned four or five times in a three year period is convincing evidence that his professed intent to return is sincere and plausible.  In fact, the Eleventh Circuit has held that a plaintiff's profession as an ADA tester makes it *more* likely that he would suffer the injury in fact again in

the future. *See Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1340 (11th Cir. 2013) ("Given that ADA testing appears to be Houston's avocation or at least what he does on a daily basis, the likelihood of his return for another test [at the defendant's business] is considerably greater than the *Lujan* plaintiffs' return to far away countries . . . ."). ADA testing appears to be Langer's avocation, which he confirmed in his briefing to us and at oral argument. Oral Argument 4:40–4:50. He testified at trial that he carries a camera so that he can document ADA violations whenever he comes across them. The defense cross-examined Langer about the many ADA lawsuits he has filed, emphasizing that the number was nearly 2,000.

On redirect, Langer affirmed that he would "absolutely" return to the Lobster Shop if they were to "fix the parking and have van-accessible parking" because he loves lobster and "purchase[s] lobster all the time." On recross, the defense attempted to show that Langer's intent to return to the Lobster Shop was not "genuine" because he also alleged an intent to return in the other ADA complaints he filed. But, as described previously, this reflects the type of reasoning we unmistakably rejected in *D'Lil* and *CREEC*, in which we instructed district courts not to question an ADA plaintiff's standing simply because they file numerous ADA lawsuits or are an ADA tester. *See also Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1069 (9th Cir. 2009) (Gould, J., concurring) ("[W]e accord standing to individuals who sue defendants that fail to provide access to the disabled in public accommodation as required by the Americans with Disabilities Act[], even if we suspect that such plaintiffs are hunting for violations just to file lawsuits.").

**2.**

Though the district court found that Langer had standing, it did so reluctantly. Today we make clear that district courts cannot use the doctrine of standing to keep meritorious ADA cases out of federal courts simply because they are brought by serial litigants.  Nor can district courts use improper adverse credibility determinations to circumvent our holding in *CREEC* allowing tester standing for ADA plaintiffs. Courts must "take a broad view" of standing in civil rights cases, particularly in the ADA context where private enforcement is "the primary method" of securing compliance with the act's mandate.  *Doran*, 524 F.3d at 1039–40 (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972); *see also* Elizabeth F. Emens, *Disability Admin: The Invisible Costs of Being Disabled*, 105 Minn. L. Rev. 2329, 2375 (2021) ("[A] system that relies on private attorneys general should respect and value the work done by those who take up the mantle . . . rather than expecting every disabled person to use whatever spare time and energy they have to litigate each trip to the movies.").

Here, Langer has met his burden to establish standing. He physically went to a store near his home, saw that there was a lack of accessible parking in violation of the ADA, and spent time taking 52 photos to document the violations. He has established that he is currently deterred from patronizing the Lobster Shop because of this inaccessibility, and that he intends to return as a customer once the store provides accessible parking.  He also intends to return, and *has* returned, to assess the Lobster Shop's ongoing compliance with the ADA because of his avocation as an ADA tester.

Langer, a serial ADA litigant, pulled into what he thought was the parking lot for customers of the Lobster Shop.  He went there because he liked lobster, or to test for ADA compliance, or perhaps both.  His motivation is not relevant.  We only evaluate whether a plaintiff has an intent to return, and we hold that Langer does.  We agree with the district court that Langer has standing to bring this claim against the defendants.[4]

## III.    ADA CLAIM

Having discussed Langer's credibility and standing, we next address the merits of his ADA claim.  Entering judgment for the defendants, the district court held that Langer did not establish an ADA violation because the Lobster Shop's parking lot "was not a place of public accommodation."  After a bench trial, we review the district court's findings of fact for clear error and its legal conclusions *de novo*.  *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 843 (9th Cir. 2004).  A district court's interpretation, construction, and application of the ADA is reviewed *de novo*.  *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 904 (9th Cir. 2019).  We reverse the district court because its judgment rests on legal error and its factual finding that the parking lot was not open to the public is clearly erroneous in light of the business owner's testimony.

---

[4] We also agree with the district court that the lawsuit is not moot. Although the defendants now keep the front gate to the lot closed, Milan Kiser admitted it might be on a "temporar[y]" basis.  Gates can be reopened after lawsuits, and painted lines demarcating spaces can be painted over.  We hold, like the district court, that this action is not moot under the voluntary cessation doctrine. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

## A.

Congress enacted the ADA to "provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2). The ADA recognized that discrimination against people with disabilities often comes not from "invidious animus, but rather of thoughtlessness and indifference." *Alexander v. Choate*, 469 U.S. 287, 295 (1985). Title II of the Act applies to state and local governments and ensures that people with disabilities are not "excluded from . . . or denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C § 12132. Title III, by contrast, applies to private entities that open themselves up to the public. *Id.* at § 12182.

Title III's general rule, and the basis for an action under Title III, is that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." *Id.* The district court erred as a matter of law by analyzing whether the parking lot itself was a "place of public accommodation" rather than whether it was a "facilit[y] . . . of any place of public accommodation." *Id.* In bringing this action, Langer did not contend that the Lobster Shop runs a public parking lot but rather that the Lobster Shop offered "facilities, privileges, advantages" in the form of parking to some of its customers but not to other customers, like Langer, who need a van-accessible parking space. The district court's analysis of the parking lot as a place of public accommodation misinterprets the ADA and its implementing regulations.

We start with the text of the statute, as we must.  *Van Buren v. United States*, 141 S. Ct. 1648, 1654 (2021).  In the definitions section of Title III, Congress did not define "a place of public accommodation" but instead provided an illustrative list of twelve types of private entities that qualify as public accommodations.  42 U.S.C. § 12181(7).  The Lobster Shop, as the district court correctly found, falls under § 12181(7)(e) which includes "a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment."

Parking lots, however, are notably absent from § 12181(7)'s list.  So, too, are similar terms like bathrooms, doors, ramps, and pathways.  We have previously noted that the types of establishments included in the ADA's list of public accommodations have something in common:

> They are actual, physical places where goods or services are open to the public, and places where the public gets those goods or services. The principle of *noscitur a sociis* requires that the term, "place of public accommodation," be interpreted within the context of the accompanying words[.]

*Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000).  Under traditional principles of statutory interpretation such as *expressio unius* and *noscitur a sociis*, we interpret the text of Title III to indicate that a parking lot is not itself a place of public accommodation but rather is a "facility" encompassed in the "goods, services, facilities, privileges, advantages, or accommodations" offered by a place of public accommodation.  42 U.S.C. §

12182(a). *See Yates v. United States*, 574 U.S. 528, 543–46 (2015).

The regulations implementing the ADA support our conclusion. Though the text of the ADA does not define facility, the ADA's regulations do define this term. A facility is "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock . . . roads, walks, passageways, *parking lots*, or other real or personal property, including the site where the building, property, structure, or equipment is located." 28 C.F.R. § 36.104 (emphasis added). By explicitly including a parking lot within the definition of a facility, the implementing regulations demonstrate that the district court committed legal error by considering whether the Lobster Shop parking lot is itself a separate place of public accommodation rather than a facility of such place.

Further, the specific Title III prohibition implicated by this appeal is § 12182(b)(2)(A)(iv), which provides that a place of public accommodation discriminates on the basis of disability by "fail[ing] to remove architectural barriers" in "existing facilities" where removal is "readily achievable." The corresponding regulation lists "[c]reating designated accessible parking spaces" as one example of "readily achievable" steps to remove architectural barriers. 28 C.F.R. § 36.304(b)(18). The regulation also prioritizes the barriers that places of public accommodation should remove, designating as the first priority "provid[ing] access to a place of public accommodation from public sidewalks, parking, or public transportation," which includes "providing accessible parking spaces." § 36.304(c)(1). The district court needed to look no further than the text of Title III and its implementing regulations to discern that the Lobster Shop parking lot constitutes a facility of a place of public

accommodation rather than a free-standing place of public accommodation.

## B.

After determining that the parking lot at issue is a facility and not itself a place of public accommodation, the next question is whether the Kisers discriminated against Langer on the basis of his disability by not offering a van-accessible parking space in their parking lot. This requires examining whether the parking lot facility was open to the public.

We find guidance in two of our prior decisions. In *Doran*, we affirmed the district court's grant of summary judgment to a convenience store where the plaintiff claimed that the store violated the ADA by excluding him from an employees-only restroom. 524 F.3d at 1048. While excluding people with disabilities from the "retail portion" of the store would be illegal discrimination under Title III, we decided the same cannot be said for the "portion that is closed to the public," including the employees-only restroom. *Id. Doran* provides instructive value to answering the question at issue in this case, but its value is limited by a significant factual difference. Unlike here, the plaintiff in *Doran* had not alleged that the store was allowing customers without disabilities to use the employees-only restroom but not customers with disabilities. Instead, he alleged that the store violated the ADA *per se* by refusing to open its employees-only restroom for use by disabled people. *See Doran v. 7 Eleven*, No. SACV 04-1125 JVS (ANx), 2005 WL 5957487, at *6 (C.D. Cal. Aug. 19, 2005).

Another case in which we have examined the public-versus-private distinction under Title III is *Jankey v. Twentieth Century Fox Film Corp.*, 212 F.3d 1159 (9th Cir. 2000). There, a disabled plaintiff sued a film studio under

the ADA because three facilities on the private studio lot—an event space, a shop, and an ATM—contained accessibility barriers. *Id.* at 1160–61. The film company restricted its studio lot to employees and authorized guests, but the plaintiff presented evidence that he visited the lot without a guest pass several times and was waved through by security. *See Jankey v. Twentieth Century Fox Film Corp.*, 14 F. Supp. 2d 1174, 1180 (C.D. Cal. 1998). We affirmed summary judgment in favor of the defendant, agreeing with the district court that because the facilities at the studio lot were "not in fact open to the public," Title III did not require those facilities to be accessible. 212 F.3d at 1161. We rested our holding on the text of 42 U.S.C. § 12187, which states that Title III of the ADA "shall not apply to private clubs or establishments exempted from coverage under Title II of the Civil Rights Act." Because Title II of the Civil Rights Act exempts any "private club or other establishment *not in fact open to the public*," 42 U.S.C. § 2000a(e) (emphasis added), we reasoned that any private entity or facility "not in fact open to the public," is also exempt from Title III of the ADA. *See* 212 F.3d at 1161.

A helpful principle that can be drawn from our decisions in *Doran* and *Jankey* is that when facilities within a place of public accommodation are closed to the public, those facilities do not need to comply with Title III of the ADA. This does not mean, however, that places of public accommodation can circumvent the commands of Title III simply by claiming a facility is "private" or hanging up an employees-only sign when a person using a wheelchair enters the building.

We have not previously delineated the bounds of when a facility is, in fact, open or closed to the public, but do so here. We hold that courts must rely upon the actual usage of the

facility in question to determine whether it is "in fact" open to the public.  Absent information about actual usage, considerations such as the nature of the entity and the facility, as well as the public's reasonable expectations regarding use of the facility, may further guide a court's analysis.

## C.

The actual usage of a facility controls because the ADA specifies that it does not apply to private entities exempt from Title II of the Civil Rights Act, and Title II of the Civil Rights Act exempts private establishments "not *in fact* open to the public."  42 U.S.C. § 2000a(e) (emphasis added). Whether a facility is "in fact" open to the public requires examining the actual, not the theoretical or intended, use of a facility.  *See In fact*, Black's Law Dictionary (11th ed. 2019) ("Actual or real; resulting from the acts of parties rather than by operation of law.").  Thus, actual usage has dispositive weight in evaluating whether a facility needs to be accessible to people with disabilities.

Because actual usage is the key, the district court erred by giving controlling weight to the terms of the lease agreement between the Kisers and Taylor, the Lobster Shop owner, to determine whether there was an ADA violation. For example, the district court concluded that the lease agreement "did not permit Mr. Taylor or the Lobster Shop to have customers park in its designated parking space"  and that the Lobster Shop "only had the authority to invite [Langer] into the areas which it had control under pursuant to the Lease Agreement."  The district court stressed that the "Lobster Shop lacked the authority to invite customers into space that was not leased to it under the Lease Agreement." And in discussing whether Langer's presence on the

property constituted a trespass, the district court found that "the intent of the Lease Agreement was that Mr. Taylor and his wife, and no one else, were to park in the designated parking spot . . . . indicat[ing] that the East Lot was not a place of public accommodation."

These conclusions conflict with our precedent that property owners cannot contract away liability under the ADA. *See Botosan v. Paul McNally Realty*, 216 F.3d 827, 832 (9th Cir. 2000). In *Botosan*, much like the posture of this case, a plaintiff sued property owners and their tenant, alleging noncompliance with the ADA due to a lack of accessible parking at the tenant's business. *Id.* at 829–30. The lease agreement between the landlord and tenant allocated responsibility to the tenant for maintenance of the property and compliance with laws. *Id.* at 830. We relied upon the text of the ADA, its legislative history, and its implementing regulations to hold that the defendant property owner could not contract away ADA liability. *Id.* at 832–34. We held that "contractual allocation of responsibility has no effect on the rights of third parties," *i.e.,* disabled individuals like Langer seeking access to places of public accommodations. *Id.* at 833. The landlord is a necessary party to an ADA suit "regardless of what the lease provides" because the landlord can later "seek indemnification from the tenant pursuant to their lease agreement." *Id.* at 834.

If the Kisers' liability was dictated by the terms of the lease, as the Kisers contend, this would violate *Botosan* and contravene the definition of what is "in fact" open to the public. Giving actual usage controlling weight, rather than terms of a lease inconsistent with usage, makes good sense because a person with a disability who attempts to park in a store's parking lot does not know the specific terms of the lease between the property owner and the business owner.

The disabled person sees customers parking in the lot, and naturally wants the equal access to which the disabled person is entitled under the ADA.

## D.

Overwhelming evidence at trial showed that the parking lot was, in fact, open to customers of the Lobster Shop. Throughout the bench trial, the Lobster Shop owner, Taylor, testified that customers would park in the lot at issue. He testified that he understood the lease with the Kisers to mean that customers could park in the lot "if a space was available." He suggested that the Kisers gave Taylor four spots "two for [his] trucks and then two for parking." When asked if it was "common for customers" to park in the lot, he testified that "if there was a space available, they would park" there. As to the gate, Taylor testified that before Langer brought this lawsuit, the gate was "always open." Taylor agreed that a customer would not have been trespassing if he parked in the lot in September 2017 because customers had "a right to park there." He testified that it was his understanding upon signing the lease that he or his customers could park in the lot if space was available. Taylor's testimony establishes that customers were allowed to, and did, park in the lot. In fact, the district court itself summarized that "Plaintiff solicited testimony from both Mr. Taylor and Mr. Kiser that despite Defendants' intent to keep the East Lot limited to tenant parking, Mr. Taylor had customers and family park in his designated parking spot."

The district court's finding that the parking lot was closed to all members of the public regardless of their disability status is directly contradicted by the testimony of Taylor and Kiser that the district court itself cited. The district court's conclusion that the parking lot was not open

to the public is also in tension with its holding that the case was not moot "because the Lobster Shop could offer parking to customers *again*."

The testimony at trial suggests not only that customers parked in the lot, but that Taylor himself encouraged customer parking. He explained that "he installed the Lobster Parking Sign in between parking stalls 1 and 2 to show customers where the store is, where to go, and where to park." And even after Kiser noticed the "Lobster Parking Sign" and asked Taylor to remove it, Taylor did not. Langer also provided a photo from his investigator showing lobsters painted on the ground in front of parking space #1 "that, per the shop owner, 'let[] customers know, 'Follow these lobsters into the building from parking stall 1.'" The actual practice of customers routinely and indiscriminately using the parking lot for Lobster Shop parking is strong evidence that the facility was, in fact, open to the public.[5]

Properly viewed as a facility of the Lobster Shop, the defendants' parking lot was open to the public and within Title III's reach. We reverse the entry of judgment for the defendants and remand with instructions for the district court to enter judgment for Langer.

## IV.    TRESPASS CLAIM

After Langer filed his ADA claim against the Kisers, they filed a counterclaim against him for trespassing on their property. Langer contends the Kisers filed the trespass counterclaim in retaliation for him exercising his First Amendment right to petition the government and sue for

---

[5] Because the actual practice was not disputed, we need not discuss ancillary considerations such as the commercial nature of the Lobster Shop or the reasonable expectations of customers.

equal access under the ADA.  Langer filed a motion to strike the trespass counterclaim as a strategic lawsuit against public participation ("SLAPP").  California has an anti-SLAPP statute allowing for the pre-trial dismissal of certain actions that "masquerade as ordinary lawsuits," but are intended "primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances,"  Cal. Civ. Proc. Code § 425.16(a).  The district court denied the motion to strike, and Langer appeals this decision.

## A.

Although Langer did not appeal the district court's interlocutory order denying the motion to strike the trespass claim, we still have jurisdiction to reach this issue.  The denial of an anti-SLAPP motion is an immediately appealable final decision pursuant to the collateral order doctrine.  *See Batzel v. Smith*, 333 F.3d 1018, 1025–26 (9th Cir. 2003), *superseded in part by statute on other grounds as stated in Breazeale v. Victim Servs., Inc.*, 878 F.3d 759, 766–67 (9th Cir. 2017); *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013).  That Langer waited until after trial to appeal the district court's denial of his motion to strike does not deprive us of jurisdiction.  Appeals of interlocutory orders are "permissive, not mandatory." *Baldwin v. Redwood City*, 540 F.2d 1360, 1364 (9th Cir. 1976).  "We have never held that failure to appeal an interlocutory order barred raising the decided issue after entry of a final judgment." *In re Frontier Props., Inc.*, 979 F.2d 1358, 1364 (9th Cir. 1992).  We have jurisdiction to review the district court's denial of Langer's motion to strike the trespass counterclaim.

Similarly, because "the purpose of an anti-SLAPP motion is to determine whether the defendant is being forced to defend against a meritless claim" that seeks to intimidate or harass him, "the anti-SLAPP issue therefore exists separately from the merits of the [underlying] claim itself." *Batzel*, 333 F.3d at 1025. Thus, even though the district court ultimately declined to exercise supplemental jurisdiction over the trespass counterclaim, we may still review its pretrial decision to decline to strike the trespass claim as a SLAPP.

## B.

In ruling on an anti-SLAPP motion, courts are to use a two-step process. First, a court must decide whether the defendant of the potential SLAPP (here, Langer), made "a threshold showing" that the cause of action in the challenged SLAPP arises from an act in furtherance of First Amendment "right of petition or free speech . . . in connection with a public issue." *Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2010) (quoting *Equilon Enters., LLC v. Consumer Cause, Inc.*, 52 P.3d 685, 694 (2002)). Second, if the defendant satisfies that threshold showing, the burden shifts to the plaintiff bringing the SLAPP claim (here, the Kisers) to show a "reasonable probability" of prevailing on the merits of the underlying claim. *Batzel*, 333 F.3d at 1024. This requires showing that "the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment." *Hilton*, 599 F.3d at 903.

Langer met his burden for the first step. Approaching the Kisers' property to assess ADA compliance was an act in furtherance of Langer's right to petition under the First Amendment. The threshold showing encompasses "not

merely actual exercises of free speech rights," such as the ADA action Langer later filed, but also "conduct that furthers such rights," such as entering the property and documenting ADA noncompliance. *Hilton*, 599 F.3d at 903; *see also* Cal. Civ. Proc. Code § 425.16(e)(4) (defining an act in furtherance of a person's right to petition to include "any conduct in furtherance of the constitutional right of petition . . . in connection with . . . a public issue or an issue of public interest"). California's anti-SLAPP statute is to be "construed broadly." *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 595 (9th Cir. 2010) (quoting Cal. Civ. Proc. Code § 425.16(a)).

As to the second step, the district court held that the Kisers established a "reasonable probability" of prevailing on their trespass claim. The potential SLAPP claim should be dismissed only if "no reasonable jury could find for" the party bringing the action. *Makaeff*, 715 F.3d at 261 (quoting *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001)). For a trespass claim in California, a plaintiff must prove, among other elements, a "lack of permission for the entry or acts in excess of permission." *Ralphs Grocery Co. v. Victory Consultants, Inc*., 225 Cal. Rptr. 3d 305, 317 (Ct. App. 2017). The bench trial revealed, however, that customers had permission from the Lobster Shop owner to park in the lot. But the district court did not have the benefit of these facts arising from trial at the time it ruled on Langer's motion to strike the trespass counterclaim. The Kisers raised "sufficient factual questions" at the pretrial stage to prevent us from concluding that "no reasonable jury could find for" them on the trespass claim. *Makaeff*, 715 F.3d at 261.

While the circumstances of this case, and the unusual parking situation at the Lobster Shop, do not permit us to

hold that the district court erred in denying the pretrial motion to strike the trespass counterclaim, our holding on this issue should not be interpreted as encouragement of landlords filing trespass claims against ADA complainants. State-law trespass claims may not be wielded as a weapon to silence accessibility advocates.

## C.

Though we hold that the district court did not err in denying Langer's motion to strike the trespass counterclaim, this is not the end of our discussion of this claim. The district court determined in its "Conclusions of Law" section that "Plaintiff's presence within the East Lot constituted a trespass." That legal conclusion is a decision on the merits to the trespass counterclaim. But the district court "decline[d] supplemental jurisdiction over Defendants' counterclaim for trespass," and so had no jurisdiction to issue a ruling on it. District courts may not issue holdings for claims on which they decline jurisdiction, so we vacate the district court's legal holding regarding the trespass claim.

## V. CONCLUSION

The parking lot was a facility of the Lobster Shop, which is a place of public accommodation. The parking lot should have been accessible to Langer. We reverse the district court's judgment and remand with instructions to enter judgment for Langer. If the ADA is to live up to its promise of being a "comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 8 U.S.C. § 12101(b)(1), we must interpret it to require businesses to make facilities that are open to some customers accessible to those that are disabled. And we must not allow district courts to question the "legitimacy" of an ADA plaintiff's intent to return to a place of public

accommodation simply because the plaintiff is an ADA tester or serial litigant.

The judgment of the district court is **REVERSED.** The district court's award of costs is **VACATED.**

---

COLLINS, Circuit Judge, dissenting:

After a bench trial in this Americans with Disabilities Act ("ADA") lawsuit, the district court found that Plaintiff-Appellee Chris Langer was not a credible witness in light of his less-than-trustworthy demeanor, the stark inconsistencies in his testimony and past statements, and the implausibility of some of his claims. In light of that credibility determination, the court specifically found that Langer did *not* have any intention of returning to and patronizing the property at issue here—namely, the "Gour Maine Lobster" shop, a store operated by a tenant of Defendants-Appellants Milan and Diana Kiser. This factual finding is not clearly erroneous, and it means that Langer lacked Article III standing to seek prospective injunctive relief. Because such relief is the only remedy available in a private suit under the ADA, Langer's ADA claim should have been dismissed for lack of Article III standing. Although the district court failed to recognize that its findings meant that Langer lacked Article III standing, it nonetheless proceeded to reject Langer's ADA claim on the merits. I would affirm the dismissal of Langer's ADA claim with prejudice, but only on the threshold ground that Langer failed to prove Article III standing. Because the majority finds standing and reverses the dismissal of Langer's ADA claim on the merits, I respectfully dissent.

# I

## A

Langer is a disabled man who requires the use of a wheelchair for mobility. He is an avowed ADA "tester" plaintiff who seeks to enforce that statute by routinely bringing private actions against businesses that fail to comply with the Act's strict requirements. Over the last 18 years, Langer has filed roughly 2,000 lawsuits against various businesses, including this action and six others that Langer filed on the same day. More than 1,000 of Langer's ADA suits were filed between 2008 and 2020 in the Los Angeles-based Central District of California, even though Langer lived in the San Diego area the entire time.

The current suit is based on Langer's attempt to visit the Gour Maine Lobster shop in San Diego on September 19, 2017. Langer testified that the purpose of his visit was "for lobster," which he described as a food that he likes. The Gour Maine Lobster shop is located on Barnett Avenue, which is a major street in that part of San Diego. The shop's storefront is prominently marked overhead with a large sign stating "Live Maine Lobster," and the store's street-facing window also contains lettering stating "Gael's Wallpaper." As Langer drove past the shop, which was on his left, he saw a banner on the fence of an adjacent parking lot that said "Live Maine Lobster, Goods, Wallpaper." However, on either side of the entrance to the lot were signs stating "No Public Parking." Langer proceeded past the shop to an intersection where he could make a U-turn, and he then headed back towards the shop and turned into the adjacent parking lot.

Inside the lot, Langer saw a sign that said "Wallpaper", "Live Lobster", and "Parking," and that sign had an arrow

above it pointing to a designated parking space. Three
spaces over from that designated space was a marked
handicapped space, but it "lacked an 'access aisle' to the
right of the space." The lack of such a dedicated aisle posed
an obstacle for Langer, who uses a special mobility van with
an extendable ramp that deploys from the passenger side.
Because the ramp must extend eight feet from the vehicle,
Langer can park only in handicap-accessible parking spaces
with a dedicated access aisle to the right. Langer could not
safely park in a handicapped space that lacks a dedicated
access aisle even if the adjacent space on the right happens
to be vacant, because if that space is taken by another vehicle
while he is shopping, he would then be unable to re-enter his
van.

Seeing that there was no spot in which he could park,
Langer did not attempt to enter the lobster shop. Instead,
using a camera that he carries with him for documenting
ADA violations and for other purposes, Langer proceeded to
take 53 photographs of the shop and the parking lot, and he
then left.

Langer has driven by the lobster shop on several
occasions, but he has not stopped there again since his first
visit. Langer drove by the store the night before trial, and he
saw that the gate into the adjacent parking lot was now
closed. Langer testified that, because he likes lobster and
"purchase[s] lobster all the time," he would return to the
Gour Maine Lobster shop if it were made ADA compliant.

**B**

In January 2018, Langer sued the Kisers, alleging that
the parking lot violated Title III of the ADA. Specifically,
he alleged that the failure to provide an access aisle adjacent
to the handicap-accessible parking space constituted a

violation of the ADA. For his claims under the ADA, Langer sought only injunctive relief, attorney fees, and costs. Langer also asserted a pendent claim under California law, and the Kisers filed a counterclaim against Langer for state law trespass.

After a bench trial, the district court found that Langer had failed to show a violation of the ADA and dismissed his ADA claim with prejudice. En route to that result, the court also made findings as to Langer's credibility and his standing under Article III.

The district court found that Langer's testimony was "not credible," and that it was "rehearsed," and "unreliable." Based on this adverse credibility determination, the district court made a specific finding that, at the time Langer filed this suit, Langer in fact "did not intend to return" to the Gour Maine Lobster shop "to purchase lobster." Relatedly, the court concluded that Langer's "purpose" in originally visiting the property had been "to identify potential ADA violations, not to actually purchase lobster."

The court based its adverse credibility finding both on Langer's demeanor while testifying and on the substance of what he claimed. The court observed that Langer's direct testimony "was delivered in a rote fashion" and "without noticeable reflection." When Langer was cross-examined, the court noted, his counsel "appeared to be visibly coaching" him, and Langer "peppered his testimony with professions of uncertainty, lack of knowledge, or an inability to recall." As to the substance of Langer's testimony, the court noted that it was flatly contradictory as to critical points. For example, when asked about the "Live Lobster" parking sign with an arrow, Langer testified that he was "not sure" whether he saw it from the street before entering the

lot, but then a few minutes later he stated that he saw it as he
was "driving down the street." When confronted with this
inconsistency, Langer first tried to explain it as a
misunderstanding, claiming that counsel had been "talking
about as [Langer] was entering the lot," and Langer was
"talking about when [he] was in the car." Perhaps sensing
that this explanation made no sense, Langer stopped himself
in mid-sentence and then shifted to a different explanation,
claiming that "it may have been after [he] drove by again"
that he saw the sign from the street. An additional
"consideration with respect to [Langer's] credibility,"
according to the district court, was the fact that he had given
contradictory dates for the timing of his visit to the lobster
shop. At trial, Langer testified that the visit occurred on
September 19, 2017, but in his declaration under penalty of
perjury in support of his summary judgment motion, Langer
averred that the date was February 27, 2017.

The district court also concluded that Langer's
"professed intent to return" to the lobster shop was
undermined by evidence concerning his prior similar
statements about "whether he intended to return" to the
nearly 2,000 businesses he had previously sued for ADA
violations. For example, when asked about the other
businesses at issue in the six other suits he filed on the same
day as this case, Langer was largely "unfamiliar with those
suits as well as the businesses involved." The court also
pointed to Langer's 2018 deposition testimony in this case,
in which Langer testified that, for the nearly 1,000 cases he
had by then filed in federal court, he "intend[ed] to patronize
all of those 950 different businesses that [he] sued after they
corrected their violations." These included more than 600
businesses in the Los Angeles-based Central District of
California, even though Langer lived in San Diego and had

never lived in the Los Angeles area. The court also noted that Langer's blanket testimony about intending to return to every business he sued contradicted his statements in another suit pending before the same district judge. In that case, Langer was re-suing the same defendants as in a prior state court case, and he sought to avoid the preclusive effect of that earlier suit by claiming that, at the time that state suit was brought, he "had no intention of returning" to *that* store and so that state case did not address his "standing to seek ADA injunctive relief." The court concluded that the contradictory and opportunistic nature of the latter claim further undermined Langer's credibility.

In questioning Langer's professed intention to return to the Gour Maine Lobster shop, the district court also pointed to additional evidence concerning Langer's lobster-purchasing habits and his visit to this particular property. At trial, Langer testified that he had recently bought a "big lot" of lobster from Costco, which was delivered directly to him. The district court concluded that, given the complete absence of evidence about "whether the Lobster Shop has better prices than Costco," it was "doubtful" that Langer "would frequently travel to [Gour Maine Lobster] to purchase lobster, as he testified." The court also noted that Langer's complaint in this case originally claimed that he visited the property in question because he wanted to patronize both the lobster shop *and* a "Smoke Shop" that shared the same parking lot. Langer, however, "never alleged that he smoked," and he abandoned any claims "relating to the Smoke Shop" before trial, thereby "undercutting" the credibility of his original claim that he had intended to return to the Smoke Shop.

Despite specifically finding that Langer did *not* intend to return to Gour Maine to purchase lobster if it became ADA

compliant, the district court nonetheless "reluctantly" found that Langer had standing to assert an ADA claim for prospective injunctive relief.  The court found such standing "on the basis that [Langer] encountered a barrier on the date of his[] visit" to the lobster shop.  Although, in the district court's view, standing required an "intent to return in the 'imminent future' (rather than some day) but for the barriers described," the court concluded that it was bound to "follow[] the Ninth Circuit's instructions to liberally construe standing in ADA cases."

The court also noted that its conclusion on standing did not "change the outcome," because the court concluded that Langer's ADA claim failed on the merits anyway.  Specifically, the court held that, given the signage in and around the parking lot, the "parking was for tenants only."  As a result, the court held both that the lot was "not a place of public accommodation" subject to the ADA and Langer "was not denied equal access."  Having rejected Langer's ADA claim on the merits, the district court declined to exercise supplemental jurisdiction over Langer's pendent state law claim and the Kisers' pending state law counterclaim for trespass.

## II

The district court did not clearly err in rejecting, as not credible, Langer's testimony that he intended to patronize the Gour Maine lobster shop if its parking lot were made ADA compliant.  But contrary to what the district court seemed to think, that finding is fatal to Langer's Article III standing.

**A**

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citation omitted); *see also Central Sierra Env't Res. Ctr. v. Stanislaus Nat'l Forest*, 30 F.4th 929, 937 (9th Cir. 2022). These core standing requirements reflect an "irreducible constitutional minimum" that must be satisfied in every case. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

It is well settled that "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (citation omitted). Here, Langer's only federal claim is based on Title III of the ADA, which prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Title III creates a private right of action on behalf of "any person who is being subjected to discrimination on the basis of disability," *id*. § 12188(a)(1), but the remedies available are limited to those "set forth in § 204 of the Civil Rights Act of 1964, namely, 'preventive relief, including . . . a permanent or temporary injunction.'" *Arroyo v. Rosas*, 19 F.4th 1202, 1205 (9th Cir. 2021) (quoting 42 U.S.C.

§ 2000a-3(a)); *see also* 42 U.S.C. § 12188(a)(1). Accordingly, Langer had the burden at trial to establish that he has standing to seek *prospective* relief with respect to the parking lot adjacent to the Gour Maine Lobster shop.

To satisfy that burden, Langer had to show that, at the time the suit was filed, he had an *ongoing or future* injury-in-fact that was traceable to the parking lot's alleged lack of compliance with the ADA and that would be redressed by *prospective* injunctive relief. Instances of *past* discrimination—such as allegedly occurred during Langer's September 2017 visit to the parking lot—are not sufficient, without more, to establish standing to obtain prospective injunctive relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983); *Civil Rts. Educ. & Enf't Ctr. v. Hospitality Props. Tr.* (*CREEC*), 867 F.3d 1093, 1098 (9th Cir. 2017). To establish the requisite ongoing or future injury, Langer had to show either that (1) he "intend[ed] to return to a *noncompliant* place of public accommodation where he will likely suffer repeated injury"; or (2) he was "currently deterred from patronizing [the] public accommodation due to [the] defendant's failure to comply with the ADA," and "he 'would shop at the [facility] *if it were accessible*.'" *Chapman v. Pier I Imports (U.S.) Inc.*, 631 F.3d 939, 948, 950 (9th Cir. 2011) (en banc) (emphasis added) (citation omitted). Langer does not rely on the first theory, but only on the second.

In *CREEC*, we noted that this "deterrence" theory of standing for prospective injunctive relief rests critically on the premise that the facility at issue is one "to which [the plaintiff] desires access." 867 F.3d at 1098 (citation omitted). That makes sense, because if the facility is one that the plaintiff has no interest in patronizing anyway, there is no sense in which the then-present ADA violations could

be said to "deter" the plaintiff from going and also no sense in which the correction of those facilities would inure to the concrete and particularized benefit of that plaintiff. Accordingly, in finding the allegations of standing to be adequate as to the hotels at issue in *CREEC*, we emphasized that the plaintiffs there averred that "they will visit the hotels when the non-compliance is cured" and that the existing ADA violations therefore "prevented them from staying at the hotels." *Id*. at 1099. Indeed, we specifically held that, "[w]ithout such averments, they would lack standing." *Id*. That is, persons "who do not in fact intend to use the facility" if it were made ADA compliant *lack* Article III standing. *See id*.

We have reiterated this critical aspect of the deterrence theory of standing on many occasions. For example, in *Doran v. 7-Eleven, Inc*., 524 F.3d 1034 (9th Cir. 2008), we underscored that, when an ADA plaintiff rests his standing arguments on the theory that he is "deter[red] from patronizing" the defendant's facility, the plaintiff must plead and prove "his intention to return in the future once the barriers to his full and equal enjoyment of the goods and services offered there have been removed." *Id.* at 1041. And in *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031 (9th Cir. 2008), we specifically held that, in order for the out-of-town plaintiff there to invoke a deterrence theory of ADA standing against the defendant hotel, she "must demonstrate her intent to return to the Santa Barbara area and, upon her return, *her desire to stay* at the Best Western Encina if it is made accessible." *Id*. at 1037 (emphasis added).

Accordingly, to establish his standing to sue for prospective relief under the ADA, Langer had to prove by a preponderance of evidence at trial that, at the time he filed

suit, he actually intended to patronize the Gour Maine Lobster store if the parking lot adjacent to it were made ADA compliant. *See Lujan*, 504 U.S. at 561 (holding that the elements of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof"); *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) ("The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint.").

## B

After the bench trial in this case, the district court expressly concluded that Langer "did *not* intend to return" (emphasis added) to the Gour Maine Lobster shop "to purchase lobster" if the store became ADA compliant. Because Langer thus failed to prove that he would patronize the Gour Maine Lobster shop if the challenged barriers were removed, he thereby failed to establish a critical requirement of the deterrence theory of standing upon which his ADA claim was based. His ADA claim therefore should have been dismissed for lack of Article III standing without addressing the merits of his ADA claim. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998).

In nonetheless finding that Langer had standing, the district court relied on several premises that are all legally erroneous. First, the court reasoned that Langer had standing "on the basis that he encountered a barrier on the date of his[] visit" in September 2017. That reasoning is directly contrary to settled law confirming that a past injury, without more, is *not* sufficient to establish standing to seek prospective injunctive relief. *See Lyons*, 461 U.S. at 102–03; *CREEC*, 867 F.3d at 1098. Second, the court concluded that it was bound by our "instructions to liberally construe standing in

ADA cases." But no amount of liberal construction can provide a basis for disregarding the "irreducible constitutional minimum" requirements of standing at issue here. *Lujan*, 504 U.S. at 560. Third, the court concluded that it should err on the side of finding standing because it concluded that Plaintiff loses on the merits anyway. That reasoning rests on a variant of the doctrine of "hypothetical jurisdiction" that was squarely rejected in *Steel Co.* *See* 523 U.S. at 101–02. In short, the district court erred in failing to recognize that its factual findings were fatal to Langer's standing.

## C

The majority nonetheless concludes that Langer has standing, but its grounds differ from those given by the district court. First, the majority holds that the "district court's credibility determination cannot stand," and the majority therefore rejects that court's relevant factual findings. *See* Opin. at 16. Second, the majority concludes that, under what it considers to be the correct view of the facts and the law, Langer "has met his burden to establish standing." *See* Opin. at 25. The majority's conclusions are wrong.

## 1

We review the district court's factual findings after a bench trial only for clear error, and we must give "due regard to the trial court's opportunity to judge the witnesses' credibility." *See* FED. R. CIV. P. 52(a)(6). Here, the district court's factual finding that Langer did not intend to patronize the Gour Maine Lobster shop in the future is unassailable, and it is the majority's reasons for setting it aside that are clearly erroneous.

As explained earlier, the district court gave multiple reasons for concluding that Langer was not credible when he claimed that he would patronize the Gour Maine Lobster shop if it were made ADA compliant.  Unlike us, the district court observed the live testimony, and it noted that Langer's demeanor and delivery was "rote" and "rehearsed" and that his attorney was "visibly coaching" him on the stand.  The district court also pointed out that Langer's testimony was at times internally inconsistent and contrary to his prior sworn testimony or statements.  The court concluded that the credibility of Langer's professed future interest in buying lobster from this particular shop was further undermined by the fact that (1) Langer's supposed reason for initially visiting this particular property was the dubious claim that Langer also wanted to patronize an adjacent smoke shop; and (2) Langer conceded that lobster was readily available for delivery from Costco and he had recently bought a "big lot" there.  Finally, noting that Langer had brought nearly 2,000 ADA lawsuits, more than half of which were filed in another federal district, the court found it doubtful that Langer really intended to patronize this enormous number of businesses.  Considering all of these circumstances, the district court concluded that Langer was not credible when he claimed that he was interested in patronizing Gour Maine Lobster if it became ADA compliant.

All of the points identified by the district court are proper considerations in weighing Langer's testimony, and there is no clear error in the court's conclusions.  Indeed, the district court's detailed findings concerning Langer's demeanor and the multiple clear contradictions in his testimony, *see supra* at 43–44, are alone sufficient to support the district court's adverse credibility determination.  *See*, *e.g.*, *Valenzuela v. Michel*, 736 F.3d 1173, 1177 (9th Cir. 2013) (finding no

clear error in adverse credibility determination in light of contradictions and coaching); *Nicacio v. INS*, 797 F.2d 700, 705 (9th Cir. 1986) (noting that failure to recall details is a proper consideration in evaluating credibility).

Although the majority explicitly "reject[s]" the district court's "adverse credibility determination," *see* Opin. at 15, the majority ignores much of that court's reasoning and fails even to address the court's findings concerning Langer's demeanor and multiple inconsistent statements. Instead, the majority's conclusion rests primarily on the view that the district court committed *legal* error by relying on evidence concerning Langer's extensive litigation history. Such history, the majority categorically declares, "has no place in our standing analysis." *See* Opin. at 15. The majority claims that our decision in *D'Lil* supposedly established this evidentiary privilege against consideration of an ADA plaintiff's litigation history, *see* Opin. at 16, but that is wrong.

*D'Lil* merely states that, because using "past litigation" to assess credibility in ADA cases raises the potential for discouraging the vigorous private enforcement that Congress clearly intended, any such consideration of litigation history "warrants our most careful scrutiny." 538 F.3d at 1040. But while we must therefore "be particularly cautious about affirming credibility determinations that rely on a plaintiff's past ADA litigation," *id.*, that does not mean that the *underlying factual assertions* made by a plaintiff in prior litigation are somehow off limits simply because they were made in litigation and not in some other forum. Just as the inclusion of an underlying fact in an attorney-client communication does not somehow make that underlying fact privileged, *see Upjohn Co. v. United States*, 449 U.S. 383, 395–96 (1981), so too the underlying factual assertions

reflected in Langer's nearly 2,000 ADA suits are not in any sense privileged and are properly considered for whatever relevance or logical significance they may have. Here, there is no dispute that Langer's prior ADA suits reflected an underlying factual contention that he actually had the subjective intention to patronize each and every one of those stores if it were made ADA compliant. That underlying fact—just like any other relevant fact—was properly considered by the district court in assessing Langer's credibility.

Our opinion in *D'Lil* confirms that consideration of litigation history is not governed by a categorical rule, but instead turns upon the specific facts of a given case. In *D'Lil*, we concluded that the record did not support the district court's view that it was "implausible that a plaintiff with approximately sixty prior ADA suits sincerely 'intends to return to nearly every place she sues.'" 538 F.3d at 1040. The notion that D'Lil actually intended to patronize that relatively modest number of facilities was hardly implausible given the undisputed record "evidence of D'Lil's extensive and frequent travel throughout the state." *Id.* Moreover, D'Lil had presented undisputed evidence establishing "specific reasons" why she was likely to return to Santa Barbara and to the defendant hotel. *Id.* *D'Lil* thus did nothing more than make a case-specific assessment that the underlying facts about the plaintiff's other ADA suits did not provide a basis, in that case, for questioning her otherwise amply established intention to return to Santa Barbara and to patronize the defendant's hotel if it were made ADA compliant. *D'Lil* did not establish, as the majority would have it, an evidentiary privilege that precludes—as having "no place in our standing analysis"— any consideration of the implausibility of a litigant's

assertion that he or she actually intends to patronize *thousands* of stores. *See* Opin. at 15; *see also* Opin. at 21 (holding that "there must be something other than the fact that the litigant files a lot of ADA cases to instill doubt in his testimony").

The majority alternatively suggests that, even under a case-specific assessment of the trial record, the facts concerning Langer's litigation history do not in fact undermine his credibility. *See* Opin. at 18–21. According to the majority, Langer's declared intention to patronize each and every one of nearly 2,000 businesses (more than half of which were in the Los Angeles area) "says little" about the credibility of his declared intention to patronize the Gour Maine Lobster shop, particularly in light of Langer's "professed taste for lobster," the proximity of the store to his home, and the multiple times Langer said that he drove by the business. *See* Opin. at 17.

But in reaching these conclusions, the majority simply ignores the "significantly deferential" standard of review, under which we review the district court's factual findings only for clear error. *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 623 (1993). It is for the district court to assess credibility and to choose among competing reasonable inferences, and that court properly did so. The court provided specific reasons for concluding that Langer did not come across as a credible witness, and it also explained why his professed subjective interest in patronizing the Gour Maine Lobster store seemed doubtful. And as to Langer's litigation history specifically, the court properly concluded that—in contrast to the merely 60 facilities at issue in *D'Lil*—it was implausible to think that Langer intended to actually patronize the nearly 2,000 businesses that he had sued.

Because "the district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985). The majority flagrantly violates that standard by reweighing the evidence for itself and drawing debatable inferences that are more to its liking.

Accordingly, there is no clear error in the district court's decision to discredit Langer's claim that he intended to patronize the Gour Maine Lobster shop if it were ADA compliant.

**2**

The majority alternatively concludes that the district court committed legal error by focusing on whether Langer intended to return to the Gour Maine Lobster store *as a patron*. Under the majority's reasoning, even if the district court did not clearly err in finding that Langer had no intention of patronizing the store in the future, that finding was insufficient to defeat Langer's standing. According to the majority, an intention to return *as an ADA tester* is sufficient to establish Langer's standing, even if he has no interest in patronizing the store. *See* Opin. at 19–20, 25–26. The majority's view is contrary to precedent and would eviscerate the strictures of Article III.

As explained earlier, Langer's theory of injury-in-fact is based on the deterrence theory of standing endorsed in our en banc opinion in *Chapman*. Under that theory, an ADA plaintiff has a sufficient *current* injury-in-fact if that plaintiff is "*currently deterred from patronizing* [the] public accommodation due to [the] defendant's failure to comply with the ADA," and "he 'would shop at the [facility] *if it*

*were accessible*.'"  *Chapman*, 631 F.3d at 950 (emphasis added) (citation omitted).  This deterrence theory of standing is distinct from the alternative theory under which an ADA plaintiff may establish a sufficiently imminent *future injury* based on a likelihood to visit the premises in the future *while it is still not ADA compliant*.  *Id*. at 948.  Under that latter theory, the ADA plaintiff would actually encounter the barriers and suffer the resulting injury-in-fact.  But under the deterrence theory, the injury is *not* that the plaintiff will encounter the barriers.  Rather, the injury-in-fact is that, due to the presence of barriers that the plaintiff wants to avoid and intends to avoid, the plaintiff is currently being deprived of an opportunity to patronize a facility that the plaintiff *otherwise would patronize* and that the plaintiff *intends to patronize if the barriers are removed*.  As the district court correctly concluded, Langer failed to carry his burden of proof on that point.

The majority nonetheless concludes that the district court applied the wrong legal standard and that the requirements of *Chapman*'s deterrence theory of ADA standing can be satisfied even in the absence of any desire or intention to *patronize* the property if the barriers were removed. According to the majority, the deterrence theory of standing can be satisfied merely by showing that the plaintiff intends to return to the *compliant* property for purposes of verifying, as an ADA "tester," that such compliance has been achieved. That is flatly wrong.

The whole premise of the deterrence theory of ADA standing is that the plaintiff's current desire to patronize the store, and intention to do so when the barriers are removed, gives rise to a current injury that would be redressed by the sort of prospective injunctive relief that is the ADA's sole remedy.  *See Chapman*, 631 F.3d at 949–50.  That is, under

the deterrence theory, an ADA plaintiff who is being *deprived* of access to a *desired* store thereby suffers a concrete and particularized injury that is sufficient for Article III purposes.  But in the absence of any such current or future desire to patronize the store, an ADA plaintiff cannot invoke the deterrence theory to establish a cognizable injury-in-fact.  In such circumstances, the plaintiff's only "injury" is the unhappiness of knowing that some store he does not want to patronize is not obeying the law, and his only theory of redressability is that he would be gratified to see that store brought into compliance with the ADA.  "But although a suitor may derive great comfort and joy from the fact . . . that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury."  *Steel Co.*, 523 U.S. at 107.

The majority is therefore wrong in contending that Langer sufficiently established his standing based on evidence "that he returned to the premises since filing the lawsuit to assess its compliance with the ADA."  *See* Opin. at 17.  As an initial matter, the majority misstates the record, because the only evidence is that Langer had "*gone by*" the store on "four or five" occasions, *not* that he actually stopped and personally encountered the property and its then-current condition.  Indeed, that is why Langer rested solely on a deterrence theory of standing and not on *Chapman*'s alternative theory that he had "show[n] a likelihood of future injury" by proving that he "intend[ed] to return to a noncompliant accommodation and [was] therefore likely to reencounter a discriminatory architectural barrier."  631 F.3d at 950.  But in the absence of proof of a future likelihood of personally encountering the barriers, and in the absence of a

desire to patronize the business, an ADA plaintiff who merely drives by a store and observes its parking lot suffers no cognizable injury. Likewise, an ADA plaintiff who intends to visit such a store, after the barriers are removed, solely in order to verify compliance with the ADA is asserting merely a generalized interest in enforcement of the law that is insufficient for Article III standing.

The majority nevertheless contends that its expansive theory of tester standing was adopted by this court in *CREEC*. *See* Opin. at 20. That is wrong. In the cited portion of *CREEC*, we addressed and rejected the *statutory* argument that the text of the ADA excluded "tester" plaintiffs. 867 F.3d at 1101–02. Nothing in that discussion suggests, much less holds, that an ADA plaintiff who has no desire to patronize a business can establish *Article III standing* under a deterrence theory merely by claiming to be a "tester." On the contrary, elsewhere in *CREEC*, we noted that the named plaintiffs in that case *had* adequately alleged their intention to stay at the hotels "when the non-compliance is cured," and we said that, "[w]ithout such averments, *they would lack standing*" under a deterrence theory. *Id*. at 1099. *CREEC* thus merely held that nothing in the text of the ADA's private right of action excludes from its coverage a plaintiff whose desire to patronize a facility is motivated in whole or in part by a desire to assess compliance with the ADA. *Id*. at 1101. But that holding about the text of the ADA did not, and could not, purport to alter the "irreducible" constitutional requirements of Article III standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("[I]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." (citation omitted)). And nothing in *CREEC* purported to

alter *Chapman*'s articulation of the requirements of the deterrence theory of ADA standing, which (unlike the majority's radical expansion of that theory) is consistent with those constitutional limits.

Under the majority's extraordinary theory, if an ADA plaintiff has an interest in examining a property in the future to confirm its compliance with the ADA, that plaintiff has standing to sue the owner to enforce such compliance, even if the plaintiff has no interest in patronizing the facility and will not personally encounter its barriers in the future. This is pure private attorney general standing of a sort that Article III simply does not permit a plaintiff to invoke in federal court. *See*, *e.g.*, *Lee v. American Nat'l Ins. Co.*, 260 F.3d 997, 1001–02 (9th Cir. 2001).

It is particularly odd for the majority to rely on such a theory of standing here, because Langer himself insisted under oath that he was *not* relying on such a view. When asked at his deposition whether it was his "purpose in going to these businesses, to find ADA violations," Langer said "No" and instead agreed that he was "genuinely going to these businesses because [he] want[s] to patronize them all." Ironically, even the majority apparently thinks that Langer is not credible.

### III

For the foregoing reasons, the district court did not clearly err in finding that Langer's testimony was not credible and that Langer had no intention of patronizing the Gour Maine Lobster store if it were made ADA compliant. That factual finding is fatal to Langer's theory of Article III standing, which rested on the contention that, at the time the suit was filed, he was deterred from visiting a store that he wanted to patronize and would patronize if it were made

ADA compliant.     Because the district court lacked jurisdiction over the only federal claim in the case, it did not abuse its discretion in declining to exercise supplemental jurisdiction over the remaining state law claims in the case. I would therefore affirm the district court's judgment on these grounds.  I respectfully dissent.